John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TRION JAMES**,<br><br>　　　　　　　　Plaintiff,<br><br>– against –<br><br>**PORT AUTHORITY POLICE DEPARTMENT**, **PORT AUTHORITY OF NEW YORK AND NEW JERSEY**, **EDWARD CETNAR (his official capacity)**, **CHRISTOPHER MCNERNEY (in his official capacity)**, and **DOES 1–5**,<br><br>　　　　　　　　Defendants. | Case No.: 1:22-cv-02463<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Trion James ("James") by his attorneys, Balestriere Fariello, for his Complaint against Defendants Port Authority Police Department (the "PAPD"), Port Authority of New York and New Jersey ("Port Authority"), Edward Cetnar ("Cetnar") in his official capacity, Christopher McNerney ("McNerney") in his official capacity, and DOES 1–5 respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action to redress the deprivation of rights secured to James pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e).

2.      James is and continues to be a victim of racial discrimination in his scope of employment with the Port Authority and the PAPD.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this matter pursuant to U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964.

4.      Pursuant to Title VII of the Civil Rights Act of 1964, James filed charges with the United States Equal Employment Opportunity Commission (the "EEOC").

5.      On December 30, 2021, the EEOC issued to James a Notice of Right to Sue.

6.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are located in this judicial district and relevant events took place in this judicial district.

**PARTIES**

7.      James is, and, at all times mentioned in this complaint, was employed by Defendant Port Authority.

8.      Defendant Port Authority is and was at all times relevant herein a governmental entity created and authorized under the laws of the States of New York and New Jersey. Its corporate office is located in New York, New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

9. Defendant PAPD is headquartered in Jersey City, New Jersey, with precincts located across New York, New York.

10. Defendant Cetnar is the Superintendent of the PAPD.

11. Defendant McNerney is the Chief of Staff to the Superintendent of the PAPD.

**STATEMENT OF FACTS**

*The PAPD Aims to Provide Cutting-Edge Law Enforcement Experience*

12. The Port Authority maintains the PAPD as an active police force, where officers begin their careers as uniformed officers. Both uniformed police officers and detectives are supervised directly by police officers who have obtained the rank of "Sergeant" or "Detective Sergeant."

13. The rank of Sergeant is the first official supervisory level in the leadership hierarchy of the Port Authority police department. Above the rank of Sergeant are the ranks of Detective Sergeant, Lieutenant, Detective Lieutenant, Captain, Inspector, Assistant Chief, Deputy Chief, and Chief of the Department. Each rank in the hierarchy is paid more than the ranks below.

14. Sergeants are paid approximately 20–25% more than uniformed officers. In order to qualify for promotion to Sergeant, police officers must pass an examination that is administered approximately every three years.

*Defendants Begin Subjecting James to a Hostile Work Environment*

15. James joined the PAPD in 2006. As early as 2009, when James was still a police officer with the PAPD, the PAPD had been ridden with dysfunction, creating a

hostile work environment for its employees.

16.     On or around December 17, 2009, at the PAPD's annual holiday event, James was caught in a violent confrontation between two colleagues (the "2009 Incident")—which James later learned was not an uncommon occurrence for the PAPD.

17.     At the holiday event, James witnessed McNerney, who was also a police officer at the time, punch Police Officer Anthony Meyer ("Meyer") at least twice in the face.

18.     James sought to protect Meyer from McNerney's violent behavior and pushed McNerney away from Meyer.

19.     To this day, McNerney was never reprimanded for the 2009 Incident and continues to subject James to a hostile work environment because James intervened to protect his colleague.

20.     Throughout his career, James has earned an exemplary record of service and has often assisted the PAPD with recruitment efforts.

*PAPD Does Nothing as James Faces Racial Attacks*

21.     On or around December 19, 2019, James attended another PAPD holiday event (the "2019 Incident"), which was also attended by Police Officer James Zammit ("Zammit").

22.     At the event, James observed Zammit threaten a black Sergeant that "I am going to fuck you up, you fat nigger." Prior to this event, James had no relationship or regular contact with Zammit.

23. Shortly after James had observed Zammit's racist behavior, Zammit turned to James and said, "That nigger too! I am going to take him outside and fuck him in the ass until he loves me."

24. Three supervisors other than James witnessed Zammit's behavior and remarks toward James.

25. James, who was shocked by Zammit's remarks, did not reply to Zammit.

26. Shortly thereafter, James filed the appropriate disciplinary paperwork regarding the 2019 Incident, noting he was subjected to racial and sexual discrimination.

27. Despite the various departments and agencies that received James's complaint, there was no full and fair investigation.

28. Instead, James has been subjected to further hostility at his workplace for even filing the complaint, including, but not limited to, the allocation of fewer resources that would allow James to perform his duties and responsibilities.

*McNerney Continues His Campaign Against James, and Denies James a Promotion*

29. In March 2020, James applied for a Detective Sergeant position with the PAPD, which entailed an interview and examination process. Ultimately, the Superintendent of the PAPD picks and determines candidates for the Detective Sergeant position.

30. At the time, McNerney was, and remains, the Chief of Staff to the Superintendent of the PAPD, and thus McNerney had considerable influence on who was appointed as Detective Sergeant.

31. Three weeks after James's oral interview, on or about May 15, 2020, the Police Integrity Unit (the "PIU") contacted James asking to meet with him to discuss the 2009 Incident.

32. The PIU's request came more than a decade after the 2009 Incident, highlighting how McNerney was now able to influence James's career.

33. Nowhere during James's interview process was James notified that the PIU would contact him to discuss an event that took place over a decade ago. In fact, this was the first time James was contacted by the PIU in his entire career, and just weeks before the PAPD would announce the results of the Detective Sergeant position.

34. At the interview, the PIU asked several questions meant to indemnify McNerney regarding the 2009 Incident including, but not limited to, whether Meyer aggravated McNerney and if Meyer initiated the physical confrontation with McNerney.

35. Throughout the entire interview, James felt that the PIU was soliciting a range of questions—weeks before the results of the Detective Sergeant position would be announced—that were meant to elicit a response blaming Meyer, not McNerney, for the 2009 Incident.

36. James, however, provided truthful answers. It was at the meeting that James realized that McNerney, now in a position of influence, was continuing to create a hostile work environment for James because James had protected his colleague from McNerney's attack. Altogether the PIU asked more than twenty questions regarding the 2009 Incident.

37. Ultimately, following the unannounced and irregular interview by the PIU, Superintendent Cetnar did not pick James for the Detective Sergeant position.

*PAPD Retaliates and Transfers James from the World Trade Center to JFK Airport*

38. In October 2021, the PAPD was informed by the Equal Employment Opportunity Commission that it was investigating James's complaint regarding the 2019 Incident.

39. On the *same day*, the PAPD notified James that they would transfer him from the World Trade Center Command to JFK Airport. Such a transfer was never discussed with James and added three hours to James's daily commute.

40. When James inquired why he was transferred, Superintendent Cetnar replied that the transfer was "for the good of the force" while the PAPD investigated and mitigated James's "client relations matter at the World Trade Center Command."

41. James has never received further information regarding the supposed "client relations matter at the World Trade Center Command."

42. On December 7, 2021, James filed a grievance, noting that the PAPD violated the agreement (the "Memorandum of Understanding") between the Port Authority and the Port Authority Sergeants Benevolent Association, Inc. (the "SBA"), because the transfer was punitive, discriminatory, and retaliatory.

43. The Memorandum of Understanding is a collective bargaining agreement that provides a multi-step grievance procedure concluding with binding arbitration.

44. On February 11, 2022, in *The Port Authority of New York, et al. v. Port Authority Sergeants Benevolent Association, Inc.*, New York County Supreme Court Index

No. 450546/2022, the Port Authority requested the Court stay any arbitration because James's complaint was in contravention to the Memorandum of Understanding.

45. The SBA opposed the Port Authority's request on behalf of James, arguing that the Port Authority's actions was not a "Transfer" as defined by the Memorandum of Understanding.

46. The Port Authority's request to stay the arbitration is presently pending a decision from the New York Supreme Court.

47. As a result of the foregoing events, James has suffered and continues to suffer significant financial and emotional damage.

48. This includes, but is not limited to, lost income, diminished prospective earnings, loss of benefits, loss of prestige, humiliation, embarrassment, emotional pain, stress (for which James requires therapy and psychiatric medication), and other distress—none of these damages which would have existed if Defendants had not created a hostile work environment for James.

## CAUSE OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE VII
**(Employment Discrimination Based on Race and Color)**
**Against all Defendants**

49. Plaintiff realleges and incorporates each and every one of the above allegations as if set out here in full.

50. Defendants have discriminated against Plaintiff on the basis of his race, in violation of Title VII by denying to him equal terms and condition of employment,

including but not limited to subjecting him to an adverse employment action and a hostile work environment.

51. Defendants have discriminated against Plaintiff on the basis of his race, in violation of Title VII by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

52. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief.

53. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer mental severe mental anguish and emotional distress, including but limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

54. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants, awarding:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages in an amount to be determined at trial;

C. Applicable interest on the foregoing amount;

D. Costs of suit herein;

E. Investigation costs;

F. Payment of reasonable attorneys' fees; and

G. Any and all other relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.

Dated: New York, New York
       June 14, 2022

_____
John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiff*