N22CjamC?

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TRION JAMES,

                Plaintiff,

        v.                          22 Civ. 2463 (PGG)

PORT AUTHORITY POLICE
DEPARTMENT, et al.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    February 2, 2023
                                    10:00 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                    District Judge

                        APPEARANCES

BALESTRIERE FARIELLO
     Attorneys for Plaintiff
BY:  JOHN G. BALESTRIERE
     RUTH CHUNG

PORT AUTHORITY LAW DEPARTMENT
     Attorneys for Defendants
BY:  ANDREW K. RAFALAF
     MEGAN LEE
```

N22CjamC?

1          (Case called)

2          MR. BALESTRIERE:  Good morning, your Honor.  John

3    Balestriere, along with my colleague, Ruth Chung, for the

4    plaintiff, Trion James.

5          MS. LEE:  Megan Lee, Port Authority, all Port

6    Authority defendants, your Honor.

7          MR. RAFALAF:  Andrew Rafalaf, also for the Port

8    Authority defendants.

9          THE COURT:  So, in this case, the plaintiff alleges

10   discrimination retaliation under Title VII.  Today we're having

11   a status conference.

12          We were last together on November 3rd.  The parties

13   told me that discovery was proceeding appropriately.  I

14   inquired about whether there had been any discussions about

15   settlement.  The parties told me it was too early to have those

16   conversations.

17          Defense counsel raised an issue about difficulty with

18   plaintiff's medical records, haven't received them, et cetera.

19          The plaintiff is making a claim for emotional damages

20   here.  So the records sought appear to be relevant to me.  I

21   told the parties that I wanted the issue resolved so that

22   depositions could proceed as scheduled in December.

23   Plaintiff's counsel stated he didn't anticipate any issues in

24   providing the necessary records to defense counsel before the

25   deposition.

N22CjamC?

| | |
|---|---|
| 1 | The original fact discovery deadline in the case was |
| 2 | January 31st of this year.  On January 29th, plaintiff |
| 3 | requested an extension of that deadline to March 7th, 2023. |
| 4 | Plaintiff explained that it was necessary to obtain some |
| 5 | additional documents.  They requested an extension, as I said, |
| 6 | of about a five-week period. |
| 7 | The defendant, for its part, said that it wants to |
| 8 | depose the plaintiff's ex-wife.  Defendant also complains that |
| 9 | it still hasn't received plaintiff's therapy records, which are |
| 10 | the same records that we were talking about in November. |
| 11 | So, let me start with those therapy records because it |
| 12 | seems like they've been at issue for some time.  Have you |
| 13 | obtained the records? |
| 14 | MR. RAFALAF:  No, your Honor, and it's much more |
| 15 | egregious than that.  If I could take two minutes of the |
| 16 | Court's time just to explain what the Port Authority has gone |
| 17 | through and the obstruction we have received.  I'm not going to |
| 18 | bore you with what was discussed at the conferences. |
| 19 | Again, at the last conference, plaintiff's counsel |
| 20 | said they would get us those documents, and I think they said |
| 21 | in days, within days.  Instead, three weeks later, we received |
| 22 | an email from another of plaintiff's counsel's colleagues, and |
| 23 | I'm just going to read this, and this was November, three weeks |
| 24 | later.  I write, as I've learned of repeated attempts by PAPD |
| 25 | counsel to obtain the confidential medical records of our |

N22CjamC?

client directly from his mental health professionals prior to
redaction.  This is not proper.  All requests for such
documents should go through me.

Subsequently, a week later, Thanksgiving Eve at 5:16
p.m., we received a total of seven documents from plaintiff's
counsel, they're Bates stamped, and they only go back to
February of 2022 — that will become important momentarily to
your Honor.

To keep discovery on track, the PA agreed to move
forward with plaintiff's deposition on December 7, we reserved
our right to continue the deposition subject to the production
of additional documents over plaintiff's counsel's objection.

We then had a meet and confer in the middle of
December with plaintiff's counsel.  Subject to that, we
received a new medical authorization on December 15th, only
again for Dr. Marina Galea.  This one was not restricted to
February 2022.  To date, we have not received a single document
from Dr. Marina Galea.  As such, with the Court's permission,
we will send out for service, by tomorrow, a subpoena for
Dr. Galea for the medical records and for her testimony.

Additionally, your Honor, turns out that Dr. Galea is
not the only treating medical professional.  Through those
months of September, October, and November, plaintiff
identified one medical provider.  In a deficiency letter that
we sent on November 23rd, we asked plaintiff's counsel to

N22CjamC?

confirm whether Dr. Galea was the only physician.  They did not

respond.  So it wasn't until December 7th at plaintiff's

deposition that plaintiff admitted that he was seeing or had

seen three other medical professionals in the responsive time

period, the relevant time period over the last 20 years for

emotional health issues:  Dr. Frank Contacessa, his GP who has

prescribed psychotropic medication over the last decade;

Dr. Davila, another therapist plaintiff has seen; and

Dr. Taminze (ph.), a psychologist the plaintiff and his wife

occasioned prior to their divorce, which was finalized in

February 2022, the week or two before plaintiff stopped coming

to work for the alleged emotional issues he's suing herein.

            We have received documents from Dr. Contacessa, but we

only received them two weeks ago.  Again, with the Court's

permission, the PA would like to subpoena Dr. Contacessa solely

for his testimony to explain the notations, the comments in the

medical records.  Dr. Davila, the therapist, is not responding

to us or our private investigator.  I want to add, your Honor,

that we have hired a private investigator, the extraordinary

step, to get these medical records.  So Dr. Davila is not

responding to us.  And the marriage counselor told our private

investigator that he's not giving us any documents.

            As such, with the Court's permission, we also would

like to subpoena both Dr. Davila and Dr. Ives for their records

and their testimony.

N22CjamC?

1            Dr. Contacessa's records, which we received only two

2    weeks ago, indicate that plaintiff has suffered from PTSD since

3    leaving the military I believe in the early 2000s.

4    Accordingly, we reiterate our prior demand that plaintiff

5    produce any medical documentation from the military concerning

6    any emotional health issues and provide the necessary releases

7    to get those medical records from the military.

8            Lastly, your Honor, I want to be clear here that the

9    PA does not believe that our continued efforts to obtain these

10   records should at all delay things from proceeding because

11   these issues will go to, obviously, damages.  Whenever fact

12   discovery is complete and the parties are around, we are

13   prepared to move for summary judgment.

14           Thank you.

15           THE COURT:  All right.  Well --

16           MR. BALESTRIERE:  May I, your Honor?

17           THE COURT:  Yes.

18           MR. BALESTRIERE:  I think the primary thing is

19   anything our client has, he's gotten to us, we have turned

20   over.  So there's nothing from the doctors that we have held

21   back.  I understand that Dr. Galea has -- and I'm getting this

22   from the Port Authority, because I've had no communications

23   with her or her office outside of, I think, maybe late

24   December, one of my colleagues said we cannot get involved

25   here, you should maybe speak to your own counsel about this.

N22CjamC?

1    So any issues with the doctors not turning things over is not

2    something we have interfered with.

3            I do have something I'd like to say about Dr. Galea at

4    the right time, your Honor.

5            THE COURT:  Let me just cut to the chase here.  It was

6    your client's decision to make a claim for emotional distress

7    damages and by doing so, the client made relevant his mental

8    health history.

9            I also note that, apparently, the plaintiff intends to

10   argue that his divorce from his wife relates to his alleged

11   suffering from the discrimination that is the subject of the

12   case.

13           Anyway, these issues have been opened up by the claim

14   for emotional distress damages and the defendant has a right,

15   given that the plaintiff has made such a claim, to obtain

16   information, both in the form of documents and testimony.

17           With respect to, they have a bearing on plaintiff's

18   claim that the emotional distress and mental health issues he

19   has suffered stem from the alleged discrimination that he

20   experienced at the Port Authority.

21           So I understand that plaintiff's counsel is saying

22   they haven't obstructed the attempt to get discovery from the

23   therapists and physicians, but what I'm telling you is if you

24   can't ensure that the necessary documents are provided and the

25   necessary therapists and physicians are not available for

N22CjamC?

| | |
|---|---|
| 1 | deposition, it will be difficult for me to permit your |
| 2 | emotional distress claim to go forward because defendant is |
| 3 | being denied discovery.  So you and your client have a direct |
| 4 | interest in making sure that defense counsel gets the relevant |
| 5 | documents and testimony that it needs in order to explore this |
| 6 | issue of whether plaintiff's mental health issues, emotional |
| 7 | distress issues are related to the alleged discrimination he |
| 8 | suffered or, in fact, relate to other events in his life up to |
| 9 | and including the last comment that counsel made, which was |
| 10 | that he suffers from post traumatic stress disorder as a result |
| 11 | of some experience he suffered in the military. |
| 12 | So what I'm hearing from defense counsel is that they |
| 13 | want to move forward with the dispositive motion, and we'll |
| 14 | talk about that more in just a minute, but I wanted you to know |
| 15 | that if we can't resolve these issues about the documents and |
| 16 | the testimony, it will be difficult for me to allow your |
| 17 | emotional distress claim to go forward. |
| 18 | MR. BALESTRIERE:  Thank you, your Honor.  And that's, |
| 19 | frankly, very helpful. |
| 20 | Without burdening the Court with all the back and |
| 21 | forth between the parties, there were many allegations of |
| 22 | discovery misconduct on the part of me and my client.  So I |
| 23 | just want to say in court now, unless the Court has a different |
| 24 | direction, that I then shall or one of my colleagues shall |
| 25 | contact those whom the Port Authority is seeking documents from |

N22CjamC?

1     and say that they should proceed.  Meaning we'll, of course,

2     put it in the context of not providing them legal advice, but

3     discuss how this is an issue that came up and we don't want

4     them to interfere with that.

5            May I say something about the ex-wife' deposition,

6     your Honor, because that would be related.

7            THE COURT:  Yes, go right ahead.

8            MR. BALESTRIERE:  So I only had the opportunity --

9     forgive me, your Honor.  I was on trial before Judge Rochon

10    until I think 5:30 or so yesterday, so I only had the chance to

11    have a long haul with both Sergeant James, the plaintiff, and

12    Colleen Tracy James, his ex-wife, regarding the issue of the

13    deposition.  Prior to that time, it was just some emails back

14    and forth.

15           And putting aside insufficient service, lack of

16    notice, I'm not going to make an argument about that.  I do

17    oppose a deposition, but that might mean then making the

18    decision to restrict some of the evidence that Sergeant James

19    would present.  Specifically, they are not married, but they

20    have a working relationship, you could say.  They share a child

21    and it is frankly just putting a lot of stress on that

22    relationship to have to deal with these issues, with all

23    respect to Ms. Tracy James, who has engaged us, too.  She was

24    crying last night.

25           They will not, I believe, be able to get into any

N22CjamC?

1    communications that Sergeant James had with Colleen Tracy

2    James.  First, they were spouses until very recently; and then

3    second, she's a partner at White & Case, and was, in fact,

4    giving advice until we were hired and, indeed, even after that

5    time.  So I suppose she could testify as to her observations,

6    and that would be relevant to the impact that it had on

7    Sergeant James' marriage, but if the Court is saying he could

8    not testify about the impact on his marriage if Ms. Tracy James

9    is not deposed, then I can direct my client to, you know, we

10   can of course raise this in a JPTO if we get to that point,

11   that I will not be able to examine Sergeant James with regards

12   to the impact on his marriage, meaning that may not be the best

13   thing for my client in this case, but I think it's the best

14   thing for my clients in their overall relationship, so I at

15   least wanted to put that out there.  But, at this point,

16   because we think it would have a burdensome effect beyond the

17   case and would be of very limited relevance where no

18   communications could be addressed, we oppose the deposition

19   and, if need be, we'll restrict the evidence with regards to

20   the impact on the marriage.

21           THE COURT:  Does defense counsel have any reaction?

22           MS. LEE:  Your Honor, the only reason we sought to

23   depose the plaintiff's wife was because at his deposition when

24   we asked him what his damages were, he says marriage fell

25   apart.  So we believe that we're entitled to question his wife

N22CjamC?

1   about whether that was true and what the status of their

2   marriage was and the actions he was attributing to the Port

3   Authority impacted on them.  I don't think there's a privilege

4   argument there.

5          THE COURT:  I know you have a lot of things prepared

6   to say, but I'm not --

7          MS. LEE:  No, I don't.  Actually, your Honor --

8          THE COURT:  The issue is they're going to walk away

9   from a claim that his marriage ended because of his treatment

10  at the Port Authority.  So, the simple question to you is,

11  given that concession, are you interested anymore in taking her

12  deposition?

13         MS. LEE:  No, your Honor, and we've told them that all

14  along.

15         THE COURT:  Okay.

16         MS. LEE:  Thank you.

17         THE COURT:  So that issue is gone.

18         MS. LEE:  Thank you, your Honor.

19         THE COURT:  We've talked about the issues with the

20  medical records and testimony, and we're going to set a

21  schedule for a resolution of any outstanding discovery.

22         Before I do that, I want to inquire whether everyone

23  here agrees that if I extend the deadline to March 7th, 2023,

24  which is what plaintiff has asked for, do both sides believe

25  that we can complete all of the outstanding matters by that

N22CjamC?

```
1   time?

2           MR. RAFALAF:  I'm not sure, and I'll tell you why --

3   no, because they have not subpoenaed the nonparties.  They have

4   not subpoenaed these ten nonparties.

5           THE COURT:  How many nonparties?

6           MR. RAFALAF:  Ten.  Three of them are police officers

7   with the Port Authority, but who are not witnesses identified

8   by the Port Authority in its Rule 26.  On its amended Rule 26

9   disclosure, which we received a day or two ago from plaintiff,

10  they do not explain the subject matter of the testimony that is

11  being sought or would be sought or that --

12          THE COURT:  Not to cut you off, but how much time do

13  you think would be appropriate?

14          MR. RAFALAF:  We don't represent these parties.  And

15  so --

16          THE COURT:  You know what kind of discovery they want.

17  So taken that into account, you said you don't think March 7th

18  is good enough --

19          MR. RAFALAF:  Your Honor, I want to be clear.  It's

20  enough time for us, the problem is, is I don't think it's

21  enough time for --

22          THE COURT:  So you don't have an opinion.  So let me

23  turn to plaintiff's counsel, whether you are confident that you

24  can complete the necessary discovery by March 7th.

25          MR. BALESTRIERE:  Yes, your Honor, if I do get the
```

N22CjamC?

cooperation I requested from the Port Authority and if I can

explain.

         So with regards to three of the Port Authority police

officers who were noticed in December and who did not appear

for scheduled depositions, and I did not know they were not

appearing until the day of the deposition and made a record and

so forth, our view is they are in the control of the Port

Authority.  We've seen nothing to give us a contrary view.  My

understanding, and this, in part, comes from my conversations

with the client and growing up with a lot of cops, is that the

unions have some kind of agreement with the Port Authority that

if any of these individuals are going to be sued or deposed,

that they are to get union counsel.  Meaning there is some

agreement, from what I understand, though I'm not totally sure,

between the Port Authority Police Department and the unions

that Ms. Lee and Mr. Rafalaf say would not represent them, and

that's fine.  I had asked for -- I got one name with a phone

number on January 20th when I thought we worked out everything.

I have received no more information to try to coordinate these,

meaning I don't care to pick a fight over who controls whom, if

I can just get them to be deposed.  So I would at least ask for

the Court's instruction that they assist in getting these in.

We can get these in if we get the cooperation with the Port

Authority.

         There are five, I think very quick, who I came to

N22CjamC?

1   understand are third-party witnesses that observed an incident.

2   I believe they're all security officers, your Honor, so they

3   are not Port Authority employees.  They observed an incident at

4   One World Trade Center.  I have also asked, since January 20th,

5   for the contact information so I can at least coordinate

6   formally subpoenaing whoever I must, because I'm not totally

7   sure, just to get them in the office.  I think these could be

8   one-hour depositions.  So if we get the cooperation of the Port

9   Authority, yes, March 7th will be good enough for us, your

10  Honor.

11          MS. LEE:  Can I just respond to the -- the nonparties

12  that he thinks that we control are controlled by Durst at One

13  World Trade --

14          THE COURT:  He actually just said he didn't think you

15  control them.

16          MS. LEE:  He's been sending us letters and we told him

17  we don't.

18          THE COURT:  He just said that there are some security

19  officers.  Is that who you're talking about, the security

20  officers?

21          MS. LEE:  They're not just security officers, they're

22  employees of Durst.  Durst Security, not --

23          THE COURT:  Well, it sounds like the security officers

24  that he just referenced and he said he actually didn't think

25  you controlled them, that's what he just said.

N22CjamC?

1          MS. LEE:  So -- okay.

2          THE COURT:  So what I'm going to do because there's a

3     number of outstanding matters here — there's the depositions

4     the plaintiff wants to take, there's this problem with the

5     medical records — I'm going to set a final deadline of

6     March 31st.  So any discovery that needs to be taken in this

7     case will have to be completed by March 31st.

8          In the event that the lawyers encounter difficulties,

9     I want to know about it right away.  I will try to address the

10    problem, and if I can't, I will refer it to the magistrate

11    judge, who is Judge Gorenstein, and he will resolve it because

12    we need to bring discovery to a close so that we can proceed

13    with a dispositive motion if there's going to be one.

14          So, I will issue an order today that provides for a

15    final fact discovery deadline of March 31st.  That order will

16    say that any party seeking to file a dispositive motion will

17    submit a premotion letter in accordance with my individual

18    rules by April 7th, and any response is to be put in by

19    April 14th.  After I read your letters, I will either enter a

20    briefing schedule or if it seems productive for us to have a

21    conference at that point, I will schedule a conference and

22    discuss the proposed motion.

23          Let me inquire of defense counsel, because you said

24    you wanted to file a dispositive motion, could you give me some

25    sense of what you expect will be the centerpiece of your

N22CjamC?

1    argument for relief?

2           MS. LEE:  Your Honor, the argument would be that

3    there's no hostile work environment.  That's one of the claims

4    based on the plaintiff's testimony.  The complaint talks about

5    a 2009 incident at a party that had nothing to do with the

6    plaintiff.  He was a bystander who says he became involved, but

7    there's no kind of action taken against him.  He had no further

8    encounters with one named defendant, McNerney, actually to

9    date.  So, to the extent that he's claiming McNerney created a

10   hostile work environment or discriminated against him, it's

11   simply not there.

12          He has a claim in there that he had a direct encounter

13   and was called racist names at an off-duty Christmas party in

14   2019.  When that was reported to the Port Authority, it was

15   thoroughly investigated.  The Port Authority brought the

16   officer up on charges and recommended that he be terminated

17   because of the procedure that is negotiated between the Port

18   Authority and the PBA.  The arbitrator decided that the charges

19   did not merit major discipline, and an arbitrator who is a

20   third-party downgraded them.  The Port Authority itself took

21   the position that this behavior was serious and should have

22   been dealt with, but it was constrained because of the

23   contract.

24          With respect to the failure to promote claim, the

25   plaintiff claims that McNerney somehow interfered with his

N22CjamC?

1    detective-sergeant promotion when, in fact, the reason he

2    wasn't promoted to detective-sergeant was because he didn't

3    pass the oral interview, which had nothing to do with McNerney,

4    that a process is administered by the human resources

5    department and the oral interview consists of a panel of three

6    officers who ask him the same questions that all the other

7    candidates are asked and they're rated.  His rating was not --

8    he was not recommended, so that is the reason he didn't get

9    promoted.

10           With respect to the other allegation they raise in the

11   complaint is that he was moved out of his command at World

12   Trade Center because he had complained about discrimination.

13   In fact, he was moved out of the command at World Trade Center

14   because he had an off-duty encounter at One World Trade with

15   Durst Security because he was late for his reservation to go up

16   to Legends and have dinner, the kitchen had closed and he was

17   insisting on going up.  He had a police officer, an on-duty

18   police officer go over to the building with him.  She was

19   witnessing this encounter between him and the Durst Security

20   people at One World Trade.  He was saying that he owned the

21   buildings, did they know who he was.  It triggered a complaint

22   from Durst to the Port Authority which triggered an

23   investigation by the Office of Inspector General, all of which

24   has been turned over to the plaintiff.  And when the

25   superintendent of police received notification of what had

N22CjamC?

happened, he had Sergeant James moved to JFK for the good of

his service.  His union contested that move and in the state

court 1975 proceeding, the court said that we were allowed to

do what we did.

So those are the allegations in the complaint and we

believe that all of those are subject to dismissal.

MR. BALESTRIERE:  Do you want me to redress, your

Honor?

THE COURT:  Sure.

MR. BALESTRIERE:  The short of it is that there's many

things that they say which we deny, and this is not, say, a

document case or even some of the findings that Ms. Lee states.

I disagree that the findings even say what they do, so that

this is not a case ripe for a Rule 56 after motion.  I mean, I

expect, nonetheless, we'll file one, and if there are premotion

conference letters, we can get into more details, but this is

one of those he-said, he-said type of cases with regards to

say, for example, the incident at One World Trade Center where

Sergeant James has a very different explanation or different

story, I should say, as to what happened.

One comment that there is no claim with regards to the

2009 party that Ms. Lee talked about, but that it does provide

background for what we believe to be some of the initial

animosity between some of the named defendants who are senior

supervisors at the Port Authority and Sergeant James.

N22CjamC?

```
 1          I could say more if your Honor wishes, but that's the
 2   sum-up of why --
 3          THE COURT:  No, I don't think it will be profitable or
 4   productive to have extended argument.
 5          My only reaction to what I heard is that I did hear
 6   defense counsel say there was a hostile work environment claim
 7   in the case, and given this is a Title VII case, that's going
 8   to require proof of pervasive activity.  If the plaintiff is
 9   going to oppose a motion on that claim, there has to be an
10   evidentiary record that would allow a jury to be able to
11   conclude that the element of pervasive activity is satisfied
12   here.  Of course, I'm not familiar with the discovery, so I
13   don't know whether it is or it isn't, but I want to make sure
14   that if we're going to litigate that issue, there is a
15   good-faith basis for concluding that the high standard for a
16   hostile work environment claim is met in this case.
17          MR. BALESTRIERE:  Understood, your Honor.
18          THE COURT:  So, we have a schedule.  We'll enter it in
19   the form of a written order later today.  As I said, it is my
20   hope that you can work together cooperatively to finish up the
21   necessary discovery so this case can move forward.  If for some
22   reason there's a problem, as I've tried to make clear, I want
23   you to let me know because either myself or the magistrate will
24   get involved quickly to try to resolve the problem so that it
25   doesn't delay the schedule that we've agreed on today.
```

N22CjamC?

1        MR. BALESTRIERE:  May I raise one other issue?

2        THE COURT:  Yes.

3        MR. BALESTRIERE:  Especially because you frankly have

4   given us a little more time, I don't think we should slow down

5   anything in your Honor's schedule, but I always think that if

6   you can try to resolve a matter, it makes sense.  I just tried

7   a case that wasn't resolved, so we see how that goes.

8        I wondered if the Court would consider ordering us to

9   mediation.  I have mediated matters before Magistrate Judge

10  Gorenstein before.  My only concern, but though I know this

11  imposes a cost on the parties, is that the magistrates don't

12  tend to have the time that a private mediator does, so I might

13  suggest a private mediator.  I'm hardly going to ask the Court

14  to order a private mediator, but I do think that if we could

15  try to mediate it, we have talked and that hasn't gone

16  anywhere, that that could resolve it.  And, at a minimum, if we

17  all go forward, we know we really tried.

18       THE COURT:  Let me give you my reaction.  First of

19  all, as you know, we do have the court, meaning this district

20  has a mandatory mediation program for employment cases.  But,

21  separate and apart from that, I don't force people to go to

22  mediation or to a settlement conference.  If there's interest

23  in both sides, I encourage that and, to state the obvious, if

24  both sides agree to that a settlement conference before Judge

25  Gorenstein might be productive, nothing would make me happier

N22CjamC?

1    than to do a referral to him for that purpose.

2              My reaction is, as we talked about at the outset of

3    the conference, there is this claim for emotional distress

4    damages.  Defense counsel leads me to believe that they think

5    that whatever emotional distress plaintiff might be suffering

6    is attributable to other causes, and so I wonder about whether

7    it's premature at this point to have a settlement discussion

8    because there's still not a clear understanding of the facts.

9    So, what I wonder about is whether the appropriate time for a

10   settlement conference or a mediation might be when some of this

11   outstanding discovery has been completed and the parties have a

12   better sense of what the facts actually are than they do today.

13   That's my reaction.  As I said, if both sides feel at any point

14   between now and when we see each other again or when the

15   premotion letters come in, that it might be productive to have

16   a settlement conference or mitigation, let me know, and

17   anything I need to do to facility that, of course I'm happy to

18   do.

19             MR. BALESTRIERE:  Thank you, your Honor.

20             THE COURT:  All right.  Anything else?

21             (Pause)

22             Thank you, all.  Have a good day.

23                              * * *

24

25