UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRION JAMES,

                    Plaintiff,

      - against -

PORT AUTHORITY POLICE
DEPARTMENT, PORT AUTHORITY OF
NEW YORK AND NEW JERSEY,
EDWARD CETNAR, in his official
capacity, CHRISTOPHER MCNERNEY, in
his official capacity, and DOES 1-5,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Civ. 2463 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Trion James asserts employment discrimination and retaliation claims

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") against Defendants the Port

Authority of New York and New Jersey (the "Port Authority"),[1] Edward Cetnar – who is the

Superintendent of the Port Authority Police Department – and Christopher McNerney – who is

Cetnar's Chief of Staff. (Am. Cmplt. (Dkt. No. 8) ¶¶ 10-11) Plaintiff contends that Defendants

discriminated against him on the basis of his race, and retaliated against him after he complained

about that discrimination. (See id. ¶¶ 49-60)

        The Complaint was filed on March 27, 2022 (Dkt. No. 1), and the Amended

Complaint was filed on June 15, 2022. (Dkt. No. 8) On August 9, 2023, Defendants moved for

summary judgment. (Dkt. No. 54)

---

[1] Plaintiff also names "Port Authority Police Department" as a Defendant, but the Police
Department is not a separate legal entity. (See Jt. Ltr. (Dkt. No. 15) at 1 n.1)

For the reasons stated below, Defendant's motion for summary judgment will be granted.

## BACKGROUND

### I. FACTS[2]

#### A. The Port Authority

The Port Authority was created in 1921 by New York and New Jersey, with the consent of Congress. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 1 (citing McKinney's Unconsol. Laws of New York § 6404)) The Port Authority has a Public Safety Department (the "PAPD") that employs approximately 1,600 police officers. (Id. ¶ 3)

#### B. Plaintiff's Background and Port Authority Employment

Plaintiff James is a Black man who immigrated to the United States from Guyana when he was nine years old. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 123) He enlisted in the United States Marine Corps when he was seventeen, serving for five years. (Id. ¶ 124)

Plaintiff joined the PAPD in 2006. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 11) After completing training at the academy, he was assigned to variety of PAPD facilities. (Id.) In 2013, James was promoted to sergeant. In 2019, Plaintiff was assigned to the PAPD's World Trade Center ("WTC") command. (Id. ¶¶ 12-13) The WTC campus includes the Oculus Transportation Hub, One World Trade Center, Three World Trade Center, Four World Trade

---

[2] To the extent that this Court cites facts drawn from movants' Local Rule 56.1 statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disagrees with movants' characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Center, the National September 11 Memorial and Museum, Liberty Park, Saint Nicholas Greek

Orthodox Church and National Shrine, and the Ronald O. Pearlman Performing Arts Center. (Id.

¶ 5)  One World Trade Center was built by the Port Authority and the Durst Organization in a

public-private partnership, and is operated and managed by Royal 1 WTC Management LLC.

(Id. ¶ 6)

      **C.**     **The 2009 Holiday Party Incident**

        On December 17, 2009, James attended an off-duty holiday party at a bar in New

Jersey.  The party was not a Port Authority-sanctioned event.  (Id. ¶ 109)  Plaintiff observed

PAPD Officer Christopher McNerney punch PAPD Officer Anthony Meyer twice in the face.

(Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 127)  Plaintiff shoved McNerney to distract him from

Meyer, and then punched McNerney twice after McNerney "clenched his fist."  (Lee Decl., Ex. 7

(James Dep.) (Dkt. No. 55-11) at 140:4-141:21)[3]  James has not worked with or spoken to

McNerney about this incident since December 2009.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 114;

Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 134:24-135:1)  Plaintiff has not discussed this

incident with other police officers, and did not file a complaint or report with his commanding

officers or the EEOC concerning it.  (Id. ¶ 115-17)

        In 2021, another PAPD police officer brought the 2009 incident to the attention of

the Port Authority Office of Inspector General (the "OIG").  (Id. ¶ 118)  The OIG opened an

investigation concerning the 2009 incident, and interviewed Plaintiff and other witnesses.  (Id.

¶ 119)  After completing its investigation, the OIG concluded that "no incriminating information

---

[3]  The page numbers of documents referenced in this Opinion – other than as to deposition transcripts – correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Citations to depositions are to the page numbers assigned by the court reporter, rather than to the page numbers designated by this District's ECF system.

was established" against McNerney.  (Lee Decl., Ex. 48 (July 16, 2021 OIG Memo) (Dkt. No. 55-52) at 8)

**D.**     **The 2019 Holiday Party Incident and Plaintiff's Discrimination Complaint**

On December 19, 2019, James attended an off-duty holiday gathering at a bar near the WTC.  The party was not a Port Authority sanctioned event.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 52)  While at the party, James observed PAPD Officer James Zammit call another Black PAPD sergeant "nigger."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 132)  Zammit then turned to Plaintiff and repeated the same racial slur to him, saying that he was going to "take [James] outside and fuck him in the ass until he loves me."  Zammit also referred to Plaintiff as a "faggot."  (Id. ¶ 133; see also Am. Cmplt. (Dkt. No 8) ¶¶ 22-23)

On December 25, 2019, James filed a complaint with his commanding officer concerning this incident.  Plaintiff reported that Zammit had made homophobic remarks towards himself and directed racial epithets at another sergeant.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 57) The PAPD Office of Diversity and Inclusion opened an investigation concerning the December 19, 2019 incident.  (Id. ¶ 58)  Plaintiff was interviewed as part of that investigation on January 2, 2020.  (Id.)  The Office of Diversity and Inclusion completed its investigation on January 15, 2020, and recommended that Zammit's employment be terminated.  (Id. ¶ 59)

The employment conditions of PAPD officers were governed at the time by a Memorandum of Agreement ("MOA") between the Port Authority Police Benevolent Association, Inc. (the "PBA") and the Port Authority.  (Id. ¶ 8)  MOA Article XXVII and Appendix G to the MOA govern the disciplinary process.  (Id. ¶ 61; Lee Decl., Ex. 4 (MOA) (Dkt. No. 55-8) at 3-9, 23-35)  Pursuant to these provisions, disciplinary charges against a PAPD officer are submitted to a Board of Inquiry – a three-person review panel composed of a Port Authority representative, a PBA representative, and a neutral party.  (Def. R. 56.1 Stmt. (Dkt.

No. 55) ¶ 62)  When the disciplinary charges involve potentially major discipline – as in

Zammit's case – the proceedings are informal and not transcribed.  A majority of the Board of

Inquiry panel members can also vote to downgrade the disciplinary charge to one seeking only

minor discipline.  (Id. ¶¶ 63-64)

The disciplinary charges against Zammit were presented to the Board of Inquiry

on July 20, 2021.  (Id. ¶ 66)  A Board majority voted to downgrade the charges against Zammit

to minor discipline, which precluded his termination.  (Id. ¶¶ 67-68)

E.      **The 2021 Detective Sergeant Promotion Process**

On March 16, 2021, the Port Authority issued a "Promotion Opportunity

Announcement" for the position of PAPD detective sergeant.  (Lee Decl., Ex. 10 (Promotion

Opportunity Announcement) (Dkt. No. 55-14) at 2)  After submitting a request to their

commanding officer and completing preliminary paperwork, applicants were screened by a

promotion review board.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 17-18)  Applicants who met the

initial screening requirements were then scheduled for a qualifications review meeting ("QRM")

interview with a panel composed of two senior PAPD representatives and a representative from

the Port Authority Human Resources Department.  (Id. ¶ 19)  QRM panel members were not told

who they were interviewing until the day of the interview, and usually only minutes before the

interview.  (Id. ¶ 21; Lee Decl., Ex. 12 (Dec. 9, 2021 McSorley Interview) (Dkt. No. 55-16) at 1)

During the QRM interview, panel members asked each candidate six pre-

determined questions that were designed to shed light on the candidate's qualifications and

suitability for the detective sergeant position.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 22-23)  The

Port Authority Human Resources Department provided each panel member with a

comprehensive multi-page rating form that contained rating instructions, questions, rating

summaries, and evaluation checklists for each question.  (Id. ¶ 22)  The scoring of candidates'

answers was based on an answer key checklist. Candidates were given a score of one (lowest) to five (highest) based on whether their answer addressed the issues identified in the answer key checklist. (Id. ¶ 24-25; Lee Decl., Ex. 15 (Jan. 12, 2022 Franga Interview) (Dkt. No. 55-19) at 1)

Based on the aggregate scores awarded by the panelists for each question, the Human Resources Department assigned each candidate a QRM rating of "Exceptional," "Qualified," or "Needs Development." (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 27-28) A candidate who received a rating of "one" or "two" on two or more questions received a QRM rating of "Needs Development." (Id. ¶ 29)

After tabulating the results from the QRM interview, the Human Resources Department prepared a promotion recommendations list for the detective sergeant position. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 30) According to Michael Ford, the Manager for Assessment Services in the Port Authority Human Resources Department, a candidate who received a QRM rating of "Needs Development" would be categorized as "Not Recommended," and would not be included in the promotion recommendations list – which was prepared by the Human Resources Department without any involvement from Defendants Centar or McNerney. (Ford Aff. (Dkt. No. 55-1) ¶¶ 16, 23)

PAPD Superintendent Cetnar was authorized to promote to the rank of detective sergeant only those candidates who were included on the promotion recommendations list. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 34; Ford Decl. (Dkt. No. 55-1) ¶ 18 ("The Superintendent of Public Safety, with concurrence from the Human Resources Department and the Chief Security Officer,

selected candidates for promotion to the rank of detective sergeant from among those candidates who were on the Promotional Recommendations List.")[4]

**F.      Plaintiff is Not Promoted to Detective Sergeant**

James applied for the detective sergeant position in March 2021.  (Id. ¶ 35)  On Friday, April 23, 2021, the Human Resources Department notified Plaintiff's command that the QRM for the detective sergeant candidates would take place on April 29 and 30, 2021.  (Id. ¶ 36; Lee Decl., Ex. 18 (Apr. 23, 2021 email) (Dkt. No. 55-22) at 2)  The Staff Lieutenant at WTC Command who was responsible for scheduling the QRM interviews was out of work that Friday and the following Saturday and Sunday.  (Id. ¶ 37)  When the Lieutenant returned to work on Monday, April 26, 2021, he emailed all of the candidates under his command (including Plaintiff) the QRM interview schedule.  (Id. ¶ 38; Lee Decl., Ex. 20 (Apr. 26, 2021 email) (Dkt. No. 55-24) at 2)  Plaintiff's QRM interview was scheduled for April 29, 2021, at 8:00 a.m.  (Id.) James did not request that his QRM interview be rescheduled for a different day or time.  (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 124:17-126:4)

Plaintiff's QRM interview proceeded as scheduled.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 41)  His QRM interview panel consisted of PAPD Deputy Police Chief James McSorley (a White male), PAPD Deputy Police Inspector Brian McPherson (a Black male), and Human Resources Department representative Vilma Frangaj (a White female).  (Id. ¶ 42)  James

---

[4] At deposition, Plaintiff disputed that Superintendent Cetnar could only select candidates from the promotion recommendations list, testifying that "the superintendent has all the authority" in selecting who is promoted.  (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 105:15-18)  Beyond Plaintiff's unsupported and conclusory testimony, however, he has not proffered evidence that Cetnar was free to ignore the promotion recommendations list.  Given these circumstances, Plaintiff has not proffered evidence sufficient to create a genuine issue of material fact on this point.  See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, . . . nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation.") (internal citations and quotations omitted).

received a QRM rating of "Needs Development"; was therefore "Not Recommended" for the detective sergeant position; and was not placed on the promotion recommendations list used by Superintendent Cetnar to select candidates for promotion. (Id. ¶ 43; Lee Decl., Ex. 16 (Promotional Recommendation List) (Dkt. No. 55-20); id., Ex. 13 (June 3, 2021 email) (Dkt. No. 55-17) at 3)

As of the time the detective sergeant promotion process was conducted, Superintendent Cetnar had never met James. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 32; Lee Decl., Ex. 17 (Cetnar Dep.) (Dkt. No. 55-21) at 31:18-25 ("Q. . . . Trion James is the plaintiff sitting in the room. Have you met him before? A. I don't believe so.")) Plaintiff was not selected for the detective sergeant position.[5] (Am. Cmplt. (Dkt. No. 8) ¶ 37)

### G.    Plaintiff's 2021 Ethics Complaint

On June 16, 2021, James filed a complaint with the Port Authority's Chief Ethics and Compliance Officer concerning possible retaliation. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 44) Plaintiff's complaint was referred to the Port Authority OIG for investigation. Although the record does not reveal the substance of James's complaint, it appears that it relates to Defendants' failure to promote him to detective sergeant, because during the OIG's investigation each member of Plaintiff's QRM interview panel was interviewed. (Id. ¶¶ 45-46)

During the OIG investigation, panel member McPherson reported that he had "met James once at a [Port Authority] Technical Center during an event prior to [the] QRMs, but he did not know him and never worked with him." (Lee Decl., Ex. 14 (Nov. 9, 2021 McPherson OIG Interview (Dkt. No. 55-18) at 3) Panel member McSorley reported that he had "met James several times in the past when McSorley was the Commanding officer in the PAPD Academy,

---

[5] The record does not reveal who, if anyone, was selected for the detective sergeant position, or the race of the individual or individuals selected.

but he never worked with James." McSorley commented that "James was always polite, and [he] had an overall positive impression of James as a result of their interactions." (Id., Ex. 12 (Dec. 9, 2021 McSorley OIG Interview) (Dkt. No. 55-16) at 3) Frangaj had never met James prior to the QRM interview. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 49)

Panel members scored James's answers during the QRM interview as follows:

| Rating Element | Rating |
|---|---|
| Q1. Professional Qualifications | 3 |
| Q2: Leadership | 4 |
| Q3: Grand Larceny | 2 |
| Q4: Missing Person Incidents | 2 |
| Q5: Mutual Aid/Apprehension | 5 |
| Q6: Assault Investigation | 3 |

(Lee Decl., Ex. 13 (June 2, 2021 email) (Dkt. No. 55-17) at 2)

As McPherson and McSorley explained during their OIG interviews, James scored a "3" on question 1 because his answer was primarily focused on his prior military experience, and he failed to address various aspects of a detective sergeant's responsibilities, including working with prosecutors and other law enforcement agencies, and managing VIP events. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 50; Lee Decl., Ex. 12 (Dec. 9, 2021 McSorley OIG Interview) (Dkt. No. 55-16) at 3; Id., Ex. 14 (Nov. 9, 2021 McPherson OIG Interview) (Dkt. No. 55-18) at 3) James scored a "4" on question 2 because he gave examples of instances in which he had demonstrated leadership as a PAPD supervisor. (Lee Decl., Ex. 14 (Nov. 9, 2021 McPherson OIG Interview) (Dkt. No. 55-18) at 3) On question 3, Plaintiff received a score of

"2" because his answer was brief and he demonstrated a limited understanding of the hypothetical situation that had been posed. (Id.; Lee Decl., Ex. 12 (Dec. 9, 2021 McSorley OIG Interview) (Dkt. No. 55-16) at 3) Plaintiff also received a "2" on question 4 because his answer did not address key parts of the question, and because he again failed to show that he understood the hypothetical situation that had been posed. (Lee Decl., Ex. 12 (Dec. 9, 2021 McSorley OIG Interview) (Dkt. No. 55-16) at 3) On question 5, Plaintiff scored a "5" because his answer covered all important areas. (Id.) Finally, on question 6, Plaintiff received a score of "3" because his answer did not address key points concerning investigative steps, contacting a prosecutor's office, and vouchering evidence. (Lee Decl., Ex. 14 (Nov. 9, 2021 McPherson OIG Interview) (Dkt. No. 55-18) at 3)

McPherson, McSorley, and Frangaj all told the OIG that no one had attempted to influence their scoring of candidates for the detective sergeant position. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 51)

## H.    **Plaintiff's EEOC Charge**

On May 3, 2021, James informed the Port Authority's Labor Relations Department that he had made an appointment with the EEOC to discuss the 2019 holiday party incident. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 69) On September 9, 2021, Plaintiff filed a charge of discrimination with the EEOC. (Id. ¶ 70; see also Lee Decl., Ex. 29 (EEOC Charge) (Dkt. No. 55-33)) In his discrimination charge, James complained that he was the victim of homophobic slurs at the 2019 holiday party. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 71) James also asserted that another sergeant at the party had been called a racial epithet; he did not allege that a racial epithet had been directed towards him. (Lee Decl., Ex. 29 (EEOC Charge) (Dkt. No. 55-33) at 1)

In his discrimination charge, Plaintiff also complained that – since the incident at the 2019 holiday party – he has "had to work with co-workers and supervisors who are extremely

close personal friends with P.O. Zammit, which has created a hostile work environment for me."
(Id.)  Plaintiff also alleged that he had been retaliated against and had not been promoted to
detective sergeant "as promised" because he had testified truthfully about the incident at the
2019 holiday party.  (Id. at 2)

I.    **The One Dine Restaurant Incident and Plaintiff's Transfer to JFK**

On October 21, 2021, at about 7:00 p.m., Plaintiff attempted to access One Dine,
a restaurant located on the top floor of One World Trade Center.  (Def. R. 56.1 Stmt. (Dkt. No.
55) ¶ 75; Lee Decl., Ex. 30 (July 11, 2022 OIG Memo) (Dkt. No. 55-34) at 1)  Plaintiff's
reservation was for 6:00 p.m., but he arrived nearly an hour late.  (Def. R. 56.1 Stmt. (Dkt. No.
55) ¶ 76)  Prior to his arrival, Plaintiff called the restaurant to explain that he was going to be late
for his reservation.  (Id. ¶ 77)  The host at the restaurant, Jackson Sturkey, explained to James
that "security had closed," and "once security closes downstairs, there's no more entry for the
restaurant or the observatory."  (Lee Decl., Ex. 33 (Sturkey Dep.) (Dkt. No. 55-37) at 7:19-15,
9:2-9; Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 78)  Sturkey offered to move the reservation to another
day.  (Lee Decl., Ex. 33 (Sturkey Dep.) (Dkt. No. 55-37) at 8:22-25)  According to Sturkey,
James said that he "worked with the police department at the Port Authority" and that he "would
be able to get in."  (Id. at 9:5-15; see also Lee Decl., Ex. 34 (Oct. 25, 2021 Sturkey Interview)
(Dkt. No. 55-38) at 1)

When James arrived at One World Trade Center that evening, he asked a
uniformed PAPD officer to accompany him to the ground floor security entrance for the One
Dine restaurant.  (Def. R. 56.1 Stmt. (Dkt. No 55) ¶¶ 80-81)  Although he initially asked the
officer to help him "secure work items prior to his scheduled tour" the following day, James later
told the officer that he wanted her to assist him in gaining access to the One Dine restaurant.  (Id.
¶¶ 80, 82)

Consistent with Sturkey's warning, when James arrived at the security checkpoint to access the One Dine restaurant at One World Trade Center, the Durst security guards who staffed the checkpoint advised James that the security checkpoint and the restaurant's kitchen were closed. (Id. ¶ 83)  Although James was off duty, he was wearing his police badge and PAPD ID on a chain around his neck. (Id. ¶ 84)  When James attempted to pass through the security checkpoint in order to gain access to the restaurant, he was told that he could not access the restaurant. (Id. ¶ 88)  James asked to be allowed up to the restaurant as a "courtesy," but his request was denied. (Id. ¶ 85)  The parties agree that some sort of confrontation followed, but they disagree as to the nature of that confrontation.

According to Defendants, Plaintiff began arguing with guest services personnel and demanded to be allowed up to the restaurant. (Id. ¶ 89)  Guest services personnel attempted "to calm [Plaintiff] down," and a security manager approached Plaintiff in an attempt to diffuse the situation, but James became louder and more argumentative. (Id. ¶¶ 90-91)  James demanded to be allowed up to One Dine, saying that One World Trade Center was "his building." (Id. ¶ 92)  According to Defendants, Plaintiff also made physical contact with the Durst security manager and then accused him of assaulting a police officer. (Id. ¶ 93)  The uniformed police officer accompanying James then asked him to leave the building with her. James initially refused. (Id. ¶ 95; Lee Decl., Ex. 36 (Oct. 22, 2021 Fajardo Interview) (Dkt. No. 55-40) at 3)  The police officer then called for a supervisor. (Id. ¶ 96; Lee Decl., Ex. 36 (Oct. 22, 2021 Fajardo Interview) (Dkt. No. 55-40) at 3-4)  After the police officer's repeated requests, James eventually left the lobby. (Lee Decl., Ex. 36 (Oct. 22, 2021 Fajardo Interview) (Dkt. No. 55-40) at 4)

At his deposition, Plaintiff offered a different account. James testified that after being told that he could not access the restaurant because he was late, he told the security guard that he would "lose 100, 200 dollars whatever I put down to reserve a table." (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 168:16-21) The security guard responded that if James worked for the Port Authority, he would be able to afford it. (Id. at 168:22-24) James agreed, but the security guard became "upset," and "rais[ed] his voice and became . . . argumentative." (Id. at 168:25-169:1-6) James testified that he did not expect special treatment because he worked for the PAPD, and "[i]t wasn't a big deal" to lose the reservation, because he "could make reservations for the next date, so what." (Id. at 165:1-4, 169:18-24) But James was "disgusted" by the security guard's "macho" and "aggressive" demeanor. (Id. at 170:20-21, 171:18-22) According to James, however, he never became aggressive, never raised his voice, and never had physical contact with any of the security personnel at One World Trade Center on October 21, 2021. (Id. at 172:1-9) Instead, when denied access, James simply "said whatever" and left. (Id. at 172:24) Plaintiff also testified that the uniformed police officer who accompanied him to the security checkpoint "absolutely [did] not" attempt to persuade him to leave. (Id. at 176:23)

The PAPD Police Integrity Unit investigated the October 21, 2021 incident and interviewed, among others, a guest services employee and security personnel who were present when Plaintiff attempted to access the One Dine restaurant. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 99-100) Those interviewed stated that Plaintiff (1) was late for his reservation; (2) did not produce a ticket for access to the One World Trade Center observatory;[6] (3) gave guest services a

---

[6] To access the One Dine restaurant, a patron must purchase tickets to the One World Trade Center observatory. James told the guard at the security checkpoint that he had not purchased tickets to the observatory. (Id. ¶¶ 86-87; see also Lee Decl., Ex. 40 (OIG Interview of Security Guard) (Dkt. No. 55-44) at 4)

"hard time," "was waving his PAPD ID around saying that he was police," and stated that "he owned the building"; and (4) "said words to the effect that [the security manager] made a big mistake and they didn't know who Plaintiff was." (Id. ¶ 101)  The Police Integrity Unit provided Superintendent Cetnar with the findings of their investigation.  (Id. ¶ 102)

On October 25, 2021, Superintendent Cetnar transferred Plaintiff to the PAPD's JFK command based on the October 21, 2021 incident at One World Trade Center.  Cetnar took this step "for the good of the service" and pursuant to the Memorandum of Agreement between the Port Authority and the PBA.  (Id. ¶ 103)  Cetnar explained that this action was necessary to "mitigat[e] . . . an employee and/or client relations matter at the World Trade Center Command and/or World Trade Center facility and/or to allay any possible encumberments to a full and complete investigation of the underlying allegations."  (Lee Decl., Ex. 46 (Nov. 1, 2021 email) (Dkt. No. 55-50) at 2)

On December 8, 2021 the PBA submitted a grievance to the Port Authority challenging Plaintiff's transfer.  That grievance was denied by the Port Authority Labor Relations Department.  (Lee Decl., Ex. 47 (June 14, 2022 New York State Supreme Court Order) (Dkt. No. 55-51) at 2)  In January 2022, the PBA filed a demand for arbitration disputing the transfer.  (Id. at 3)  In response, the Port Authority filed a petition to permanently stay the arbitration in Supreme Court of the State of New York, New York County.  (Id. at 2)  The court granted the Port Authority's petition, finding that

> Sgt. James' transfer for the good of the service was expressly authorized by the MOA.  [The PBA's] argument that Sgt. James was not a transfer, but was pretextual and not authorized by the MOA is rejected.  The MOA is unambiguous with regard to transfers for the good of the service and are excluded from arbitration.  Finally, [the PBA's] argument that Sgt[.] James['] transfer was disciplinary and not for the good of the service is also rejected as it is not only conclusory, but also it belies the reasoning by Superintendent Cetnar that the transfer was for the good of the service.

14

(Id. at 4)

## II.    PROCEDURAL HISTORY

The Complaint was filed on March 27, 2022 (Dkt. No. 1), and the Amended

Complaint was filed on June 15, 2022.  (Dkt. No. 8)  Defendants answered the Amended

Complaint on August 17, 2022, (Dkt. No. 17), and filed the instant motion for summary

judgment on August 9, 2023.  (Dkt. No. 54)

## DISCUSSION

In Count One of the Amended Complaint, Plaintiff alleges that he was subjected

to employment discrimination based on his race.  (See Am. Cmplt. (Dkt. No. 8) ¶¶ 49-54)

Although it is not entirely clear from the Amended Complaint what theory of Title VII liability

Plaintiff is pursuing, this Court construes Count One as alleging failure to promote and hostile

work environment theories of liability.  Count Two alleges retaliation in violation of Title VII.

In moving for summary judgment, Defendants contend that Plaintiff has not

proffered evidence sufficient to create a material issue of fact as to any of his claims.  (See Def.

Br. (Dkt. No. 56) at 7-8)

## I.    LEGAL STANDARDS

Summary judgment is warranted where the moving party "shows that there is no

genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted).  In deciding a

summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual

inferences that could rationally be drawn, in favor of the party opposing summary judgment."

Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quotation marks and citation

omitted).  However, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.  Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks, alterations, and citation omitted).  "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13-CV-6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

　　　　　A moving party can demonstrate the absence of a genuine issue of material fact "in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quotation marks and citation omitted)

　　　　　"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment[,] 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).  However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (omission in original) (quoting Meiri v.

Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).  As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts[.]' . . . [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  "Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact."  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and the] 'nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful.'") (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) and Jeffreys, 426 F.3d at 554).

## II.    CLAIMS AGAINST DEFENDANTS CETNAR AND MCNERNEY

The Amended Complaint alleges Title VII claims against Edward Cetnar and Christopher McNerney.  (See Am. Cmplt. (Dkt. No. 8) ¶¶ 10-11)  "Title VII does not impose liability on individuals[, however]."  Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012); see also Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

Acknowledging this precedent, in his opposition brief Plaintiff states that he "shall drop his claims against Defendants Cetnar and McNerney."  (Pltf. Opp. Br. (Dkt. No. 53) at 28)  Accordingly, Defendants' motion for summary judgment will be granted as to Defendants Cetnar and McNerney.

## III.    TITLE VII FAILURE TO PROMOTE CLAIM

### A.    Applicable Law

Title VII prohibits an employer from discriminating "against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). The framework for analyzing Title VII claims is well established:

> [Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 (1981), . . . the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb, 521 F.3d at 138 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)) (internal citations omitted). The Second Circuit has "consistently applied McDonnell Douglas at the summary judgment stage[.]" Bart v. Golub Corp., 96 F.4th 566, 573 (2d Cir. 2024).

In order to establish a prima facie case of race discrimination under a failure to promote theory, a plaintiff must show "'(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications.'" United States v. City of New York, 717 F.3d 72, 84 (2d Cir. 2013) (quoting McDonnell Douglas, 411 U.S. at 802). "'[T]he fourth element is also established if the employer

fills the position with a person outside the protected class who was similarly or less qualified than the plaintiff.'" Turner v. Wilkie, No. 18CV4038 (LMS), 2020 WL 5371023, at *7 (S.D.N.Y. Sept. 8, 2020) (quoting Yu v. New York City Housing Development Corp., 494 Fed. App'x. 122, 125 n.5 (2d Cir. 2012)). "In all [Title VII] cases, for the plaintiff to avoid an adverse judgment, there must be proof that the plaintiff 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)).

Plaintiff's burden in presenting a prima facie case is "not onerous"; indeed, it is "de minimis." Burdine, 450 U.S. at 253; Beyer, 524 F.3d at 163; see also Hollander v. American Cyanamid Co., 172 F.3d 192, 199 (2d Cir. 1999) ("[T]he burden of proof that must be met to establish a prima facie case is minimal."). Although the standard for a prima facie case is low, "a plaintiff's case must fail if []he cannot carry this preliminary burden." Beyer, 524 F.3d at 163.

Where a plaintiff establishes a prima facie case, "'[t]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 254-55) (emphasis in St. Mary's Honor Ctr.).

Where a defendant has "'articulate[d] some legitimate, nondiscriminatory reason' for its adverse action[,] . . . the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." Bart, 96 F.4th at 570 (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83 (2d Cir. 2015). "To satisfy the third-stage

burden under <u>McDonnell Douglas</u> and survive summary judgment in a Title VII disparate

treatment case, a plaintiff may, but need not, show that the employer's stated reason was false,"

because "a plaintiff may also satisfy this burden by producing other evidence indicating that the

employer's adverse action was motivated at least in part by the plaintiff's membership in a

protected class." <u>Id.</u> at 576.

In determining whether a defendant's stated reasons are pretextual, courts are

"decidedly not interested in the truth of the allegations against plaintiff," but in "'what <u>motivated</u>

the employer.'" <u>McPherson v. New York City Dep't of Educ.</u>, 457 F.3d 211, 216 (2d Cir. 2006)

(quoting <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)) (emphasis in

McPherson); <u>see also Moore v. Kingsbrook Jewish Med. Ctr.</u>, No. 11 Civ. 3625 (MKB), 2013

WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]hat an employee 'disagrees with an

employer's evaluation of that employee's misconduct or deficient performance, or even has

evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself,

that the employer's proffered reasons are pretext.'") (quoting <u>Grant v. Roche Diagnostics Corp.</u>,

No. 09–CV–1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011)).

**B.**    **<u>Analysis</u>**

**1.**    **<u>Prima Facie Case</u>**

The parties dispute whether James has established the second element of his

<u>prima facie</u> case – <u>i.e.</u>, whether he was qualified for the detective sergeant position.  Defendants

contend that Plaintiff was not "qualified" for the position because his performance on the QRM

interview resulted in a rating that did not place him on the promotion recommendations list from

which Superintendent Cetnar was required to select.  (Def. Br. (Dkt. No. 56) at 17-18)  Plaintiff

counters that "Defendants have presented no specific evidence for why the 'Highly

Recommended' candidates were selected over James despite his military and other experience,"

and therefore Defendants have not met their burden for summary judgment. (Pltf. Opp. Br. (Dkt. No. 53) at 17)

As a general matter, being "qualified" for a position for purposes of Title VII "refers to the criteria the employer has specified for the position." Thornley v. Penton Publ'g. Inc., 104 F.3d 26, 29 (2d Cir. 1997).

The Second Circuit has stated that generally, in order to establish a prima facie case, a plaintiff need only make a "'minimal'" showing that he "'possesses the basic skills necessary for performance of the job.'" Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012) (quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir.2001)). Here, Michael Ford – the Manager for Assessment Services in the Port Authority's Human Resources Department – states that the Port Authority utilized a pre-QRM initial screening process that was designed "to screen-out candidates who failed to meet basic standards." (Ford. Aff. (Dkt. No. 55-1) ¶ 6) In order to pass the initial screening, applicants had to meet the following requirements: (1) at least six years as a PAPD officer; (2) a "Promotability Appraisal of Exceptional or Qualified" from the applicant's commanding officer; (3) a limited number of sick absences; (4) no pending or sustained disciplinary matters; (5) a limited number of sustained complaints; and (6) no sustained convictions for crimes while a member of the PAPD. (See Lee Decl., Ex. 10 (Mar. 16, 2021 Promotion Opportunity Announcement) (Dkt. No. 55-14) at 5-6 (describing the initial screening criteria and stating that only those who met these basic requirements could proceed to the QRM interview stage); see also Ford Decl. (Dkt. No. 55-1) ¶¶ 4-8 (describing the pre-QRM initial screening stage)) Plaintiff met these "basic standards," and thus was permitted to participate in the QRM interview process.

But because Plaintiff's poor scores on the QRM interview disqualified him for placement on the promotion recommendations list – from which Superintendent Cetnar was required to select (Pltf. R. 56.1 Stmt. (Dkt. No. 55) ¶ 43; Lee Decl., Ex. 16 (June 14, 2021 Promotion Recommendations) (Dkt. No. 55-20) at 2) – he was not "qualified" for the detective sergeant position. Stated another way, because Cetnar was not permitted to select a candidate for promotion who was not on the promotion recommendations list[7] (see Ford Decl. (Dkt. No. 55-1) ¶ 18), Plaintiff cannot be considered "qualified" for the promotion. Indeed, after the QRM interview process, Plaintiff was informed that – because of his poor QRM interview scores – he "did not reach the level needed to be recommended for promotion," and "[t]herefore, [he was] not eligible for consideration for this job at this time." (Lee Decl., Ex. 13 (June 2, 2021 email) (Dkt. No. 55-17) at 2)

Moreover, Plaintiff does not contend that the QRM interview and scoring process was discriminatory, or that the panel members acted with discriminatory animus. And while the scoring process was inherently subjective, other courts have found a plaintiff's prima facie case lacking even where the plaintiff's lack of qualifications was based on subjective criteria. See, e.g., Workneh v. Pall Corp., 897 F. Supp. 2d 121, 131-32 (E.D.N.Y. 2012) (finding plaintiff not qualified for a promotion based on negative performance reviews premised on not "acting on

_____

[7] As discussed above, Plaintiff testified that "the superintendent has all the authority" in selecting who is promoted, and was not bound to choose candidates from the promotion recommendations list. (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 105:15-18) But despite having had full discovery, Plaintiff has not proffered evidence supporting the conclusory assertions he made at his deposition. Accordingly, he has not succeeded in creating a material issue of fact as to this issue. See Jeffreys, 426 F.3d at 554 ("To defeat summary judgment, . . . nonmoving parties . . . may not rely on conclusory allegations or unsubstantiated speculation.") (internal citations and quotations omitted).

initiatives; [not] taking over some new ideas; [not] being innovative; [and not] doing things above and beyond").

Acknowledging the de minimis standard applicable to the prima facie case determination, this Court nonetheless concludes that Plaintiff has not met this standard. Plaintiff has failed to make out a prima facie case of discrimination because he was not "qualified" for the detective sergeant position as a result of his poor scores on the QRM interview, which rendered him ineligible for the promotion recommendations list from which Superintendent Cetnar was required to select candidates.

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) – cited by Plaintiff (Pltf. Opp. Br. (Dkt. No. 53) at 17) – is not to the contrary. In that case, a white male serving as a special agent for the Immigration and Naturalization Service ("INS") sought a promotion to "supervisory criminal investigator." Id. at 134. A "personnel staffing specialist" reviewed candidates' applications for the promotion and created a "Best Qualified List," which she provided to the INS New York District Director, who would make the selection decision. Id. Terry's name was not included on the Best Qualified List, and an African-American was later selected for the position. Id. The district court granted defendants summary judgment on plaintiff's race discrimination claim, finding that plaintiff was not qualified because he was not on the "Best Qualified List." Id. at 138-39.

The Second Circuit reversed, ruling that "there is a genuine issue of material fact as to whether Terry's exclusion from the list was discriminatory." Id. at 139. In so holding, the Second Circuit cited a handwritten notation on plaintiff's application which reads: "'Race: Caucasian.'" The court concluded that this note "would allow a fact-finder to conclude that [the personnel staffing specialist] was not telling the truth when she said she did not consider race"

when she created the Best Qualified List. Id. Moreover, under INS policy, the District Director was allowed to select a candidate for promotion who was not on the "Best Qualified List." Id. at 134.

Terry is not on point here because Plaintiff has not argued – much less produced evidence – that the QRM interview and scoring process was discriminatory. Moreover, Superintendent Cetnar was bound to select candidates from the promotion recommendations list, whereas the INS District Director in Terry was free to choose candidates not on the Best Qualified List.

The Court concludes that Plaintiff was not "qualified" for the detective sergeant promotion because his scores on the QRM interview rendered him ineligible for the promotion recommendations list, from which Superintendent Cetnar was to choose successful candidates. Accordingly, Plaintiff has not made out a prima facie case with respect to his Title VII failure to promote race discrimination claim, and Defendants' motion for summary judgment on that claim will be granted.

### 2.    Pretext

Even if Plaintiff had succeeded in establishing a prima facie case for his Title VII failure to promote race discrimination claim, Defendants' motion for summary judgment would still prevail, because Plaintiff has not proffered evidence sufficient to create a material issue of fact as to whether Defendants' alleged legitimate, nondiscriminatory reason for failing to promote Plaintiff – his poor performance on the QRM interview and resulting failure to qualify for the promotion recommendations list – is pretextual.

Plaintiff does not directly address whether Defendants' articulated reason for not promoting him was pretextual. He instead asserts that (1) he was given insufficient time to prepare for the QRM interview (see Pltf. Opp. Br. (Dkt. No. 53) at 18-19); and (2) he was highly

24

qualified for the promotion.  (See id. at 19)  Neither of these arguments bears on the issue of whether Defendants' alleged legitimate, nondiscriminatory reason for failing to promote Plaintiff is pretextual.

In Plaintiff's opposition brief and Local Rule 56.1 Counterstatement, he contends that he was given insufficient time to prepare for his QRM interview, and thus did not have an equal opportunity with other applicants to prepare for the interview.  (See Pltf. Opp. Br. (Dkt. No. 53) at 18-19; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶¶ 144-47)

In response, Defendants contend that the Court should not consider this allegation, which is not pled in the Amended Complaint.  In this regard, Defendants assert that "'[i]t is black letter law that a party may not raise new claims for the first time in opposition to summary judgment.'"  (Def. Reply Br. (Dkt. No. 57) at 7 (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010)))

But Plaintiff's "claim" is that – as the result of race discrimination – Defendants did not promote him to the position of detective sergeant.  Plaintiff's assertion that he was not given adequate time to prepare for the QRM interview is offered as evidence of Defendants' discriminatory acts.  The fact that this allegation is not pled in the Amended Complaint does not mean that Plaintiff is barred from offering evidence of it at summary judgment, particularly where he raised this issue at his deposition.  (See Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 119:9-121:25)

The circumstances concerning Plaintiff's notice of the QRM interview are set forth above.  The staff lieutenant at Plaintiff's command was informed about the QRM interviews on Friday, April 23, 2021, but he was out of the office that day.  Accordingly, he did not transmit notice of the QRM interviews to anyone under his command until his return to work

on Monday, April 26, 2021.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 36-38)  That day, the staff

lieutenant sent an email to Plaintiff and all of the other candidates under his command notifying

them of the dates and times of their QRM interviews.  (Id. ¶ 38; Lee Decl., Ex. 20 (Apr. 26, 2021

email) (Dkt. No. 55-24) at 2)

      At deposition, however, Plaintiff testified that he "was never notified" of the

QRM interviews, even though "all the other candidates were notified."  Plaintiff further testified

that he "found out through the other candidates that they had received the e-mail."  (Lee Decl.,

Ex. 7 (James Dep.) (Dkt. No. 55-11) at 121:15-25)

      Defendants have submitted the April 26, 2021 email giving Plaintiff and all of the

other candidates at the Port Authority's WTC Command notice of the upcoming QRM

interviews, however.  (See Lee Decl., Ex. 20 (Apr. 26, 2021 email) (Dkt. No. 55-24) at 2)  And

in his Rule 56.1 Counterstatement, Plaintiff does not dispute that the April 26, 2021 email was

sent to the listed recipients.  (See Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 38)  Given these

circumstances, Plaintiff's unsupported assertion that he did not receive notice of the QRM

interview is not sufficient to create an issue of fact as to when notice was provided.  Nor has

Plaintiff demonstrated that this issue is material, given that he (1) concededly learned of the

QRM interview and appeared as directed; (2) admitted at his deposition that he "started studying

[for the QRM interview on] March 31[, 2021, shortly after the "Promotion Opportunity

Announcement" was made]; (3) did not request that his interview be rescheduled to a later time;

and (4) has not explained in any fashion what additional preparation he would have undertaken

for the QRM interview.[8]  (See Pltf. Opp. Br. (Dkt. No. 53) at 18-19; Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 124:5-126:4)

In sum, James's unsupported assertion that he learned of the QRM interview schedule after other candidates – even though a contemporaneous email shows that all interviewees received notice at the same time – does not create a material issue of fact as to whether Defendants' alleged nondiscriminatory reason for not promoting James is pretextual.

Plaintiff also argues that he was "highly qualified" for the detective sergeant position, given his fifteen years' experience at the PAPD.  (Pltf. Opp. Br. (Dkt. No. 53) at 19) This argument does not address Defendants' alleged nondiscriminatory reason for not promoting Plaintiff, however, which is his score on the QRM interview.

The Court concludes that Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether Defendants' alleged nondiscriminatory reason for not promoting him is pretextual.  Moreover, Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether Defendants' alleged reason for not promoting Plaintiff is a pretext for race discrimination.  See Bart, 96 F.4th at 570.  That is, even accepting Plaintiff's speculation that his QRM interview score is not the real reason that he was not promoted, he has not offered evidence demonstrating that the real reason is race discrimination.

---

[8]  Given the structure of the QRM interviews – six pre-determined questions that no candidate was given notice of – it is not clear what additional preparation James could have engaged in that would have been useful.  See Lee Decl., Ex. 11 (Aug. 5, 2021 OIG Rep.) (Dkt. No. 55-15) at 3 ("The specific questions asked in a QRM, the checklists pertaining to each question, and each individual rater's score for each question are all confidential information.").

\*        \*        \*        \*

Defendants' motion for summary judgment on Plaintiff's Title VII failure to promote race discrimination claim will be granted, both because Plaintiff has failed to offer evidence sufficient to make out a prima facie case, and because Plaintiff has failed to offer evidence sufficient to create a material issue of fact as to whether Defendants' alleged nondiscriminatory reason for failing to promote him is pretextual.

## IV.    TITLE VII HOSTILE WORK ENVIRONMENT

The Amended Complaint also appears to allege a Title VII hostile work environment claim.  (See Am. Cmplt. (Dkt. No. 8) ¶¶ 49-55)

### A.    Applicable Law

Title VII permits a plaintiff to bring an action for "discriminatory conduct that manifests itself in a hostile working environment."  Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014).

In order to establish a hostile work environment claim under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "'This standard has both objective and subjective components:  the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'"  Id. at 321 (quoting Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)).

"Title VII does not prohibit all verbal or physical harassment in the workplace[, however]; it is directed only at discrimination because of [a protected characteristic]."  Oncale v.

Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (alterations omitted).  Therefore, "[i]t is

axiomatic that the plaintiff must show that the hostile conduct occurred because of a protected

characteristic."  Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (citation omitted).  An

inference of such a discriminatory intent "may be derived from a variety of circumstances,

including 'invidious comments about others in the employee's protected group,' or 'the more

favorable treatment of employees not in the protected group.'"  Dodd v. My Sisters' Place, Inc.,

No. 21 CV 10987 (VB), 2024 WL 3028474, at *11 (S.D.N.Y. June 17, 2024) (quoting Chambers

v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)).  At summary judgment, "a plaintiff

must introduce evidence of hostile conduct that a reasonable juror could find was a result of the

plaintiff's membership in a protected class."  Gore v. RBA Grp., Inc., No. 03-CV-9442 (KMK)

JCF, 2008 WL 857530, at *6 (S.D.N.Y. Mar. 31, 2008) (citing Brennan v. Metro. Opera Ass'n,

192 F.3d 310, 318 (2d Cir. 1999)).

Moreover, "[a]s a general rule, incidents must be more than 'episodic; they must

be sufficiently continuous and concerted in order to be deemed pervasive.'"  Tolbert, 790 F.3d at

439 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).  "[A] plaintiff alleging a

hostile work environment 'must [thus] demonstrate either that a single incident was

extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted"

to have altered the conditions of her working environment.'"  Alfano, 294 F.3d at 374 (quoting

Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) and Perry v. Ethan Allen, Inc., 115

F.3d 143, 149 (2d Cir. 1997)).  "'The fact that the law requires harassment to be severe or

pervasive before it can be actionable does not mean[, however,] that employers are free from

liability in all but the most egregious of cases,'" Whidbee v. Garzarelli Food Specialties, Inc.,

223 F.3d 62, 70 (2d Cir. 2000) (quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997)), and the Second Circuit has "cautioned against setting the bar too high." Terry, 336 F.3d at 148.

"In assessing whether a plaintiff has met [his] burden, 'courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" Belton v. City of New York, No. 12 Civ. 6346 (JPO), 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (alterations in original) (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014)).

Where the source of the alleged hostility is a co-worker rather than a manager, a plaintiff must show "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996)). Harassment by a co-worker may be imputed to the employer where "'plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). "'[O]nce an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it.'" Eubanks v. New York City Dep't of Educ., No. 18-CV-7877 (LJL), 2021 WL 1105065, at *1 (S.D.N.Y. Mar. 23, 2021) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000)). "Whether the [employer's] response was reasonable has to be assessed from the totality of circumstances." Distasio, 157 F.3d at 65. "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the

plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." Id.

**B.    Analysis**

Plaintiff's hostile work environment claim is predicated primarily on PAPD Officer Zammit's conduct at the December 19, 2019 holiday party. As discussed above, this incident took place while Zammit and Plaintiff were off-duty at a bar, and not during work hours or while at a Port Authority sanctioned event. Plaintiff alleges that Officer Zammit used a racial slur to refer to a Black PAPD sergeant at the bar, and then used the same racial slur, and a homophobic slur, to refer to Plaintiff. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶¶ 52, 132-33; see also Lee Decl., Ex. 27 (Apr. 28, 2021 Zammit Charges and Specifications) (Dkt. No. 55-31) at 2 (alleging that Officer Zammit called Plaintiff a "fucking faggot," called another black sergeant "nigger," and referred to "these Niggers" in the presence of Plaintiff and the other sergeant))

As discussed below, Plaintiff's hostile work environment claim fails because (1) to the extent it is based on the December 19, 2019 holiday party incident, it is time-barred; (2) the December 19, 2019 incident cannot be imputed to the Port Authority; and (3) Plaintiff has not shown that the remaining conduct he complains of was related to his race, or that it constitutes the sort of severe or pervasive conduct necessary to sustain a hostile work environment claim.

**1.    Timeliness**

"'As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC.'" Hardaway v. Hartford Pub. Works Dep't., 879 F.3d 486, 489 (2d Cir. 2018) (quoting Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003)). The time period in which a plaintiff must file a charge with the EEOC generally "depend[s] on whether a state has its own agency with authority to

investigate the claim." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176 (2d Cir. 2005). If the alleged discrimination took place in a state or locality that has its own anti-discrimination laws and an agency to enforce them, the time period for filing claims is 300 days after the alleged discriminatory act took place. Otherwise, the time period is 180 days. See 42 U.S.C. § 2000e-5(e)(1).

Here – although New York has its own anti-discrimination laws and an agency to enforce them (the New York State Division of Human Rights) – the Port Authority is not subject to New York's anti-discrimination laws, because it is the product of a New York-New Jersey compact. "[A]ccordingly, the 180-day limitation period applies in the case of an employee of the Port Authority." Dezaio v. Port Auth. of NY & NJ, 205 F.3d 62, 65 (2d Cir. 2000); Chin v. Port Auth. of NY & NJ, 685 F.3d 135, 146 (2d Cir. 2012) (applying the 180-day limitation period in a Title VII action brought against the Port Authority).[9]

Officer Zammit's alleged misconduct took place on December 19, 2019. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 52) Plaintiff did not file a charge of discrimination with the EEOC concerning this incident until September 9, 2021, however. (Id. ¶ 70; Lee Decl., Ex. 29 (EEOC Charge) (Dkt. No. 55-33) at 2)

In response to Defendants' argument that any claim premised on the December 19, 2019 incident is time-barred (see Def. Br. (Dkt. No. 56) at 23-24), Plaintiff argues that (1) the 300-day limit applies rather than the 180-day limit cited by Defendants; and (2) even if the 180 limit applies, James's claim premised on the December 19, 2019 claim is timely, because "James

---

[9] Plaintiff argues that the correct limitations period is 300 days, citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), and McGullam v. Cedar Graphics, Inc., 609 F.3d 70 (2d Cir. 2014). (See Pltf. Opp. Br. (Dkt. No 53) at 23-24) The cases Plaintiff cites are not on point, however, because they do not involve suits against the Port Authority.

received a 'right to sue' letter [from the EEOC]." (Pltf. Opp. Br. (Dkt. No. 53) at 23-24) Neither argument has any merit.

As discussed above, the correct limitations period is 180 days. But even if the 300-day limitations period were applied, that would not assist Plaintiff, because his EEOC charge was filed more than 600 days after the December 19, 2019 incident. Moreover – while the EEOC right to sue letter is a prerequisite for the filing of a federal action, the EEOC's issuance of a right to sue letter does not make an untimely Title VII claim timely. Perezic v. Crespo, 902 F. Supp. 438, 441 (S.D.N.Y. 1995) ("The fact that the EEOC issued a right-to-sue letter does not authorize a suit that is otherwise precluded by statute. In essence, Title VII imposes two timing requirements on a potential plaintiff: (1) timely filing of the charge with the EEOC and (2) filing with federal court within 90 days of the right-to-sue letter." (internal citations omitted)). Here, any hostile work environment claim premised on the December 19, 2019 incident is time-barred, because Plaintiff did not file his EEOC charge until September 9, 2021, more than 600 days after this incident. Robinson v. Coca-Cola, No. 23-CV-10552 (LTS), 2024 WL 3607379, at *2 (S.D.N.Y. July 31, 2024) ("A claim under Title VII is time-barred when a plaintiff fails to file a timely charge with the EEOC.").

### 2.    Whether the December 19, 2019 Incident Can be Imputed to the Port Authority

As discussed above, Plaintiff's hostile work environment claim is time-barred to the extent that it is premised on the December 19, 2019 incident. But even if a claim based on this incident was not time-barred, it would still fail, because Officer Zammit's conduct took place outside of the workplace, at a bar, while Zammit and Plaintiff were off-duty, and at a party that was not sanctioned by the Port Authority. Accordingly, Officer Zammit's conduct cannot be imputed to the Port Authority.

As an initial matter, it is undisputed that Officer Zammit's alleged conduct at the December 19, 2019 holiday party took place while he, Plaintiff, and the other PAPD sergeant were off-duty. It is likewise undisputed that the holiday party the three attended at a local bar was not a Port Authority event and was not sanctioned by the Port Authority. (See Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 52-54; Lee Decl., Ex. 27 (Apr. 28, 2021 Zammit Charges and Specifications) (Dkt. No. 55-31) at 2)

"'Generally, an employer is not liable as a matter of law for harassment resulting from nonwork-related, off-duty interactions between co-employees because those actions are not part of the work environment.'" Torres v. City of New York, No. 18 CIV. 3644 (LGS), 2019 WL 1765223, at *3 (S.D.N.Y. Apr. 22, 2019) (quoting Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 175 (E.D.N.Y. 2015)); see also Krause v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 10 Civ. 2603(RMB), 2011 WL 1453791, at *4 (S.D.N.Y. Apr. 13, 2011) (granting defendant employer summary judgment because, inter alia, plaintiff's allegation that her co-worker's two uninvited attempts to kiss her were not actionable under Title VII, because "these incidents . . . occurred off-site and without any [employer] involvement"); Devlin v. Teachers' Ins. & Annuity Ass'n of Am., No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting defendant summary judgment on plaintiff's sexual harassment claim because, inter alia, plaintiff's co-worker's acts occurred at a bar outside of work hours); Osier v. Broome Cnty., 47 F.Supp.2d 311, 321 (N.D.N.Y. 1999) (granting defendants' summary judgment because, inter alia, co-worker's tailgating of plaintiff's car "occurred outside of work"); Scurlock v. IRC, LP, 716 F. App'x 544, 546 (7th Cir. 2017) (affirming grant of summary judgment on Title VII hostile work environment claim where a single "utterance of the

34

n-word" "took place outside of the workplace by an employee who did not supervise [plaintiff]").

In Torres, for example, the court dismissed a New York City Police Department officer's Title VII hostile work environment claim that was premised in part on an "off-duty social event," finding that this incident took place outside the workplace and therefore could not contribute to a hostile work environment. Torres, 2019 WL 1765223, at *4; see also Devlin, 2003 WL 1738969, at *2 (granting defendant summary judgment on plaintiff's sexual harassment claim because co-worker's alleged harassment occurred at a bar outside of work hours).

In sum, to the extent that Plaintiff's hostile work environment claim is premised on the December 19, 2019 incident, Defendant Port Authority is entitled to summary judgment on that claim, both because it is time-barred and because the conduct at issue cannot be imputed to the Port Authority.

### 3. Plaintiff's Remaining Allegations Are Not Linked to Race and Do Not Meet the Standard for Demonstrating a Hostile Work Environment

In opposing Defendants' motion for summary judgment on his hostile work environment claim, Plaintiff cites to a myriad of incidents and circumstances – in addition to the December 19, 2019 incident – that he claims created a hostile work environment claim:

(1) "James was on [Chief of Staff] McNerney's bad side" (Pltf. Opp. Br. (Dkt. No. 53) at 24);

(2) other supervisors "had access to multiple monitoring screens, break areas with working televisions, and office doors for privacy, [while] James was forced to work in an open environment without any of these amenities" (id.);

(3) "James was not provided with the adequate resources required to perform his duty as a supervisor, making it practically impossible for him to fulfill his duties" (id.; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 140);

    (4) the PAPD's alleged failure to provide proper notice to Plaintiff concerning his QRM interview (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶¶ 144-47);

    (5)  an alleged "[c]ommon [p]ractice" to favor white PAPD officers over black PAPD officers (Pltf. Opp. Br. (Dkt. No. 53) at 19, 24-25); and

    (6)  the alleged disparity between the discipline imposed on Officer Zammit and Plaintiff's transfer to the PAPD's JFK command following the incident at the security checkpoint for One World Trade Center's One Dine restaurant.  (Id. at 25-26)

        As to McNerney, in his opposition brief, James says little more than "it was no secret that James was on McNerney's bad side." (Id. at 24)  Presumably Plaintiff is alluding to the 2009 incident in which he observed McNerney punch fellow PAPD officer Meyer twice in the face (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 127), leading Plaintiff to twice punch McNerney.  (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 140:4-141:21)  But the 2009 brawl – like the December 19, 2019 incident – took place outside the workplace, during a holiday party at a bar, and had no connection to the Port Authority.  The incident also was not race-related.  And to the extent that Plaintiff is suggesting that McNerney felt animosity towards him – presumably because Plaintiff punched him – he has not offered evidence that any such animosity was connected to Plaintiff's race.  See Taylor v. Seamen's Soc. For Child., No. 12 CIV. 3713 PAE, 2013 WL 6633166, at *13 (S.D.N.Y. Dec. 17, 2013) ("The 'sine qua non of a . . . discriminatory action claim under Title VII is that the discrimination must be because of the employee's protected characteristic.") (quoting Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007)) (emphasis in Patane).

        In sum, Plaintiff cannot premise a hostile work environment claim on the 2009 brawl, or on any animosity McNerney felt or exhibited towards Plaintiff as a result of the 2009 brawl.  And to the extent that Plaintiff suggests that McNerney stymied Plaintiff's effort to obtain the detective sergeant promotion, he has not proffered evidence sufficient to create a

material issue of fact as to whether McNerney was involved in or affected that decision. Indeed, the uncontroverted evidence shows that Plaintiff was denied promotion because of his poor score on the QRM interview (see Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 41-51), and that McNerney played no role in the process that led to the creation of the promotion recommendations list from which Superintendent Centar selected the successful applicants. (Id. ¶ 31; Ford Aff. (Dkt. No. 55-1) ¶ 23)

As to James's claim that he "was not provided with the adequate resources required to perform his duty as a supervisor, making it practically impossible for him to fulfill his duties" (Pltf. Opp. Br. (Dkt. No. 53) at 24), James does not explain what resources he lacked or how this alleged lack of resources made it impossible for him to perform his duties. Nor does he explain what duties he was not able to perform. (See id.) And to the extent that James complains that he needed an extra computer monitor, a television in the break room, and an office door, these matters do not demonstrate that his "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320-21 (quoting Harris, 510 U.S. at 21); see also, e.g., De la Cruz v. City of New York, 783 F. Supp. 2d 622, 645 n.15 (S.D.N.Y. 2011) (finding allegations, of inter alia, an "assignment to an undesirable office space" insufficient at summary judgment to constitute a hostile work environment); Jones v. W. Suffolk Boces, No. CV-03-3252 (ETB), 2008 WL 495498, at *2, *8 (E.D.N.Y. Feb. 20, 2008), aff'd, 330 F. App'x 329 (2d Cir. 2009) (same, where plaintiff asserted "he was assigned a 'converted dining space' as an office, with limited office supplies" and that he "had to manually operate the heat and air conditioning"); Plourde v. Snow, No. 02CV5532(SJF)(ARL), 2006 WL 4510754, at *13 (E.D.N.Y. June 14, 2006), aff'd sub

nom. Plourde v. Paulson, 236 F. App'x 656 (2d Cir. 2007) (same, where plaintiff alleged, inter alia, that she "was seated 'out on the floor in a factory layout style'" rather than in her "former office space"); Uttarwar v. Lazard Asset Mgmt. LLC, No. 22 CIV. 8139 (DEH), 2024 WL 1251177, at *2, *16 (S.D.N.Y. Mar. 22, 2024), aff'd, No. 24-1085-CV, 2025 WL 704278 (2d Cir. Mar. 5, 2025) (same, where plaintiff alleged, inter alia, that he was moved from an "allocated private office" to "the general floor with other lower-ranking personnel").

Moreover, at deposition, Plaintiff admitted that all sergeants at the WTC command were subject to the same conditions.  (Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 61:1-4 ("Q.  So just to clarify, the office that didn't have the door and the TV was the office that was shared by all the sergeants at the World Trade Center command?  A.  Yes.")  In sum, Plaintiff's complaint about the lack of "resources" provides no basis for his hostile work environment claim.

As to Plaintiff's complaint that he did not receive adequate notice of his QRM interview, as this Court explained above, the record shows that he (1) received notice at the same time, and in the same form – an April 26, 2021 email – as the other candidates assigned to the WTC command (see Lee Decl., Ex. 20 (Apr. 26, 2021 email) (Dkt. No. 55-24) at 2); (2) had been preparing for his interview since March 31, 2021 (id., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 123:5); (3) did not request that his interview be rescheduled to a later time (id. at 124:17-126:4); and (4) has not explained what additional steps he would have taken to prepare if he had been given earlier notice of his interview slot.  Finally, Plaintiff's complaint about notice does not begin to demonstrate that his "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his]

employment and create an abusive working environment.'" <u>Littlejohn</u>, 795 F.3d at 320-21
(quoting <u>Harris</u>, 510 U.S. at 21).

In attempting to demonstrate that he was subjected to a hostile work environment,
Plaintiff also asserts that it is a "[c]ommon [p]ractice" at the PAPD for White officers to be
favored over Black officers, citing the Declaration of Lance Harrison, a former PAPD lieutenant.
Harrison states that, "[f]rom as early as 2005, African Americans and other racial minorities at
the PAPD experienced hostility in the work environment," and "race was heavily considered in
PADP's hiring and promotion practice." (See Pltf. Opp. Br. (Dkt. No. 53) at 19-20; Harrison
Decl. (Dkt. No. 53-13) ¶¶ 6, 9)

Defendants contend that this Court should not consider the Harrison Declaration
because he was not timely identified as an "'individual likely to have discoverable information.'"
(See Def. Reply (Dkt. No. 57) at 8 (quoting Fed. R. Civ. P. 26(a)(1)(A)(i))) The Harrison
Declaration is dated August 2, 2023, the due date for Plaintiff's opposition brief. (See Harrison
Decl. (Dkt. No. 53-13) at 5; June 21, 2023 Order (Dkt. No. 52)) Given that Harrison was not
disclosed during discovery, his declaration is not properly before this Court on the current
motion. See, e.g., <u>Brink v. Muscente</u>, No. 11 CIV. 4306 ER, 2013 WL 5366371, at *13
(S.D.N.Y. Sept. 25, 2013) (refusing to consider affidavit at summary judgment "given
[d]efendants' failure to earlier disclose [the affiant's] existence"); <u>see also</u> Fed. R. Civ. P.
37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a)
or (e), the party is not allowed to use that information or witness to supply evidence on a
motion[.]").

In any event, Harrison's declaration is of no assistance to Plaintiff in establishing
a hostile work environment claim. While Harrison references the 2019 holiday party and the

aftermath of the 2021 One Dine incident, he otherwise does not speak to the conditions and circumstances that Plaintiff experienced. And Plaintiff, for his part, has not stated that he was aware of the other specific incidents and events cited by Harrison. In sum, Harrison's statements "cannot contribute to [Plaintiff's] hostile work environment [claim absent evidence that] Plaintiff . . . perceive[d] [the same alleged conduct] during his employment." Davis v. New York Dep't of Corr., 256 F. Supp. 3d 343, 354 n.7 (S.D.N.Y. 2017) (citing Varughese v. Mt. Sinai Med. Ctr., No. 12-CV-8812, 2015 WL 1499618, at *61 (S.D.N.Y. Mar. 27, 2015) (plaintiff must at least be generally aware of discriminatory comments for them to have contributed to alleged hostile work environment); Cestone v. Gen. Cigar Holdings, Inc., No. 00-CV-3686, 2002 WL 424654, at *3 (S.D.N.Y. Mar. 18, 2002) (harassment of which plaintiff was unaware cannot support hostile work environment claim)).

Finally, the alleged disparity between the discipline Officer Zammit received for the remarks he allegedly made at the December 19, 2019 holiday party and Plaintiff's transfer to the JFK command – as a result of the One Dine restaurant incident – is not a basis to find a hostile work environment.

The known circumstances of the disciplinary action taken against Zammit in connection with the December 19, 2019 incident have been discussed above.[10] After James filed a complaint on December 25, 2019, the PAPD Office of Diversity and Inclusion opened an investigation. That Office completed its investigation on January 2, 2020, and recommended that Zammit be fired. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 57-59) Pursuant to the Port

---

[10] The record does not disclose what discipline Zammit received, other than Plaintiff's characterization of the sanction as "minor." (See Denalli Decl. (Dkt. No. 55-2) ¶¶ 6-8; Lee Decl., Ex. 7 (James Dep.) (Dkt. No. 55-11) at 88:5-7 (Plaintiff testifying that "the arbitrator deemed that it was a minor incident and he received minor [discipline]")

Authority's MOA with the PBA, disciplinary charges against Zammit were brought before a Board of Inquiry composed of a Port Authority representative, a PBA representative, and a neutral party. (Id. ¶ 62) A majority of Board of Inquiry members can vote to downgrade disciplinary charges against an employee, and here a Board majority voted to take that step with respect to Zammit. As a result, he was not terminated. (Id. ¶¶ 63-68)

In short, the Port Authority sought Zammit's termination, but it did not control the outcome of the Board of Inquiry proceedings. Accordingly, the fact the Zammit was not fired does not suggest that the Port Authority acted with discriminatory intent in transferring Plaintiff to the JFK command because of his behavior at the One Dine security checkpoint.

In any event, Plaintiff's transfer to JFK does not demonstrate that Plaintiff's "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320-21 (quoting Harris, 510 U.S. at 21); see also, e.g., Dietrich v. City of New York, No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *17 (S.D.N.Y. July 23, 2020) (in an Age Discrimination in Employment Act and New York State Human Rights Law case, finding that "reassignment to less desirable duties, even when done as a form of discipline, is not severe or pervasive enough behavior to create a hostile work environment"); De la Cruz, 783 F.Supp.2d at 644-55 (holding that allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and a supervisor's stray remarks were insufficient to establish a hostile work environment).

*     *     *     *

For all of these reasons, the Court concludes that Plaintiff has failed to raise a material issue of fact as to whether Defendants subjected him to employment discrimination

based on race in violation of Title VII, either under a failure to promote theory, or a hostile work environment theory. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII race discrimination claim.

## V.  TITLE VII RETALIATION

In the Amended Complaint, Plaintiff alleges that Defendants retaliated against him in violation of Title VII after he complained to Defendants and to the EEOC about the December 19, 2019 incident. According to Plaintiff, in transferring him from the WTC command to the JFK command on October 26, 2021, Defendants retaliated against him for engaging in protected activity. (See Am. Cmplt. (Dkt. No. 8) ¶¶ 55-60) For the reasons stated below, this Court concludes that Plaintiff has not proffered evidence sufficient to create a material issue of fact as to his retaliation claim.

### A.  Applicable Law

"Title VII's antiretaliation provision prohibits an employer from discriminating against an employee for opposing any practice made unlawful by Title VII." Rivera v. Rochester Genesee Regional Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2012). Title VII retaliation claims are subject to the same three-step McDonnell Douglas burden-shifting framework applicable to Title VII discrimination claims. Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 65-66 (S.D.N.Y. 2016).

To establish a prima facie case of retaliation under Title VII, an employee must show "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Jute, 420 F.3d at 173). For purposes of a Title VII retaliation claim, an adverse employment action is an act that "well might have dissuaded a reasonable worker from making

42

or supporting a charge of discrimination." Burlington N. & Santa Fe R.R. Co. v. White, 548

U.S. 53, 68 (2006) (quotations omitted). A causal connection between the protected activity and

the adverse employment action must be shown. Causation at the prima facie case stage "can be

established either (1) 'directly, through evidence of retaliatory animus' toward the plaintiff, or

(2) 'indirectly,' through 'circumstantial evidence.'" Moll v. Telesector Res. Grp., Inc., 94 F.4th

218, 239 (2d Cir. 2024) (quoting Hicks, 593 F.3d at 170). For purposes of establishing a prima

facie case, it is sufficient for plaintiff to "'show[] that the protected activity was closely followed

in time by the adverse employment action.'" Bucalo v. Shelter Island Union Free Sch. Dist., 691

F.3d 119, 131 (2d Cir. 2012) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d

Cir. 2010)).

   In determining whether the necessary temporal proximity is present, "courts in

this circuit have typically measured that gap as a matter of months, not years." Id. at 131.

Indeed, "'courts in this Circuit have consistently held that a passage of more than two months

between the protected activity and the adverse employment action does not allow for an

inference of causation.'" Flood v. UBS Global Asset Mgmt., Inc., No. 10 Civ. 374(RJH), 2012

WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (quoting Frisenda v. Inc. Vill. of Malverne, 775 F.

Supp. 2d 486, 512 (E.D.N.Y. 2011) (collecting cases)).

   Where a plaintiff has established a prima facie case of retaliation, "the burden

shifts to the employer to put forth evidence of a non-retaliatory rationale." Cox v. Onondaga

Cnty. Sheriff's Dep't, 760 F.3d 139, 145 (2d Cir. 2014) (citing Holt v. KMI-Continental, 95 F.3d

123, 130 (2d Cir. 1996)). Where the employer does so, "'the presumption of retaliation

dissipates' . . . and the plaintiff must prove 'that the desire to retaliate was the but-for cause of

the challenged employment action.'" Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59,

70 (2d Cir. 2015) (quoting Jute, 420 F.3d at 173 and Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).

"'Ordinarily plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial.'" Colon v. New York City Hous. Auth., No. 16-CV-4540 (VSB), 2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021) (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)); see also Dortz v. City of New York, 904 F. Supp. 127, 148 (S.D.N.Y. 1995) ("Where a Title VII defendant's intent is at issue, summary judgment is generally inappropriate."); MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 557 (S.D.N.Y. 2012) ("The issue of intent in a [Title VII] discrimination case presents a classic jury question.").

The Second Circuit has, however, made "clear that temporal proximity 'alone is insufficient to defeat summary judgment at the pretext stage.'" Carr v. New York City Transit Auth., 76 F.4th 172, 182 (2d Cir. 2023) (affirming grant of summary judgment on Title VII, ADEA , and Section 1981 retaliation claims) (quoting Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013); see also Fletcher v. ABM Bldg. Value, 775 F. App'x 8, 14 (2d Cir. 2019) (summary order) ("[a]lthough the termination came close in time to [plaintiff's] protected activity, '[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage'") (quoting Kwan, 737 F.3d at 847). To show pretext at the summary judgment stage, a plaintiff must supplement temporal proximity with "other evidence." Id. "Absent other evidence, no factfinder could reasonably determine that [plaintiff's] protected activities were the but-for cause of [adverse employment actions]." Id. Evidence of pretext can include "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered

legitimate, nonretaliatory reasons for its actions," such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan, 737 F.3d at 846.

Given this authority, district courts in this Circuit considering a pretext allegation in connection with a retaliation claim routinely grant summary judgment where plaintiff has alleged nothing more than temporal proximity. See, e.g., Hahn v. Bank of Am. Inc., No. 12 Civ. 4151(DF), 2014 WL 1285421, at *21 (S.D.N.Y. Mar. 31, 2014) (granting summary judgment on a retaliation claim and finding pretext lacking where "Plaintiff does not point to any weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's proffered reasons for her termination"); Carr v. New York City Transit Auth., No. 16-CV-9957 (VSB), 2022 WL 824367, at *11 (S.D.N.Y. Mar. 18, 2022), aff'd, 76 F.4th 172 (2d Cir. 2023) (same, where the court determined that alleged inconsistencies were "not actual inconsistences, much less ones suggesting Defendants ever considered race or gender or age in not promoting Plaintiff"); Hongmian Gong v. City Univ. of New York, No. 18 CIV. 3027 (LGS), 2020 WL 1467353, at *4 (S.D.N.Y. Mar. 25, 2020), aff'd sub nom. Gong v. City Univ. of New York, 846 F. App'x 6 (2d Cir. 2021) (same); Kunzler v. McDonough, No. 19-CV-07181(JS)(ARL), 2024 WL 197927, at *14 (E.D.N.Y. Jan. 18, 2024) (same, where plaintiff provided "no other circumstantial or direct evidence" for pretext "other than temporal proximity"); Turner v. NYU Hosps. Ctr., 784 F. Supp. 2d 266, 277-78 (S.D.N.Y. 2011), aff'd, 470 F. App'x 20 (2d Cir. 2012) (same, where plaintiff "ha[d] not identified an inconsistency"); Naemit v. Vill. of Spring Valley, No. 20 CIV. 1882 (JCM), 2022 WL 1443675, at *12 (S.D.N.Y. May 6, 2022) (same, where "Plaintiff has not produced any evidence suggesting that this stated reason for the role's discontinuance was false").

B.       **Analysis**

1.       ***Prima Facie* Case**

The first three elements of Plaintiff's prima facie case are not in dispute.  Plaintiff

engaged in protected activity by complaining to his commanding officer on December 25, 2019

about the December 19, 2019 incident (see Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 57); by filing a

complaint with the Port Authority's Chief Ethics and Compliance Officer about retaliation on

June 16, 2021 (id. ¶ 44); by informing the Port Authority's Labor Relations Department on May

3, 2021, that he had made an appointment with the EEOC to discuss the December 19, 2019

incident (id. ¶ 69); and by filing a charge of discrimination with the EEOC on September 9, 2021

citing the December 19, 2019 incident.  (Id. ¶ 70; Lee Decl., Ex. 29 (EEOC Charge) (Dkt. No.

55-33) at 2)  Moreover, Defendants have not disputed institutional knowledge of Plaintiff's

complaints about discrimination.[11]  Finally, Defendants do not dispute that Plaintiff suffered an

adverse employment action when he was transferred from the WTC command to the JFK

command.  (See Def. Br. (Dkt. No. 56) at 27 (disputing only the fourth element – causal

connection))

As to causal connection, Defendants argue that "[g]iven that almost two years

elapsed between the time [P]laintiff initially engaged in protected activity and [when] he suffered

an alleged adverse employment action, [he] cannot rely on temporal proximity to establish his

prima facie case of retaliation."  (Def. Br. (Dkt. No. 56) at 27)

---

[11] "[F]or purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of [his] protected activity to establish the knowledge prong of the prima facie case." Kwan, 737 F.3d at 844 (citing Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)).

Plaintiff responds that he was reassigned from the WTC command to the JFK command "a month after Defendants learned that James had filed a complaint with the [EEOC]." (Pltf. Opp. Br. (Dkt. No. 53) at 27; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 151)

"[T]he relevant date in determining the existence of a causal connection is the date plaintiff last engaged in protected activity." Infantolino v. Joint Indus. Bd. of Elec. Indus., 582 F. Supp. 2d 351, 359 (E.D.N.Y. 2008) (citing Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002)). Here, as discussed above, Plaintiff filed his charge of discrimination with the EEOC on September 9, 2021 (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 70; Lee Decl., Ex. 29 (EEOC Charge) (Dkt. No. 55-33) at 2), and on October 25, 2021 – forty-six days later – he was transferred to JFK. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 14) A gap of less than two months between protected activity and an adverse action is sufficient to demonstrate temporal proximity. Accordingly, Plaintiff has proffered evidence sufficient to make out a prima facie case of Title VII retaliation.[12]

_____

[12] Defendants contend that Plaintiff's retaliation claim is barred pursuant to the doctrine of claim preclusion. (See Def. Br. (Dkt. No. 56) at 30) As discussed above, after Plaintiff was transferred to the JFK command, the PBA filed a grievance challenging his transfer with the Port Authority's Office of Labor Relations. (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 104) The Port Authority then filed an action, pursuant to CPLR § 7502, against the PBA in Supreme Court of the State of New York, New York County, seeking to stay the arbitration (id. ¶ 106), arguing that – under the Port Authority's MOA with the PBA – the PAPD Superintendent was authorized to order transfers – such as Plaintiff's transfer – that he deemed were "necessary for the good of the service." (Id. ¶¶ 103, 105) The state court stayed the arbitration, concluding that the "argument that Sgt. James was not a transfer, but was pretextual and not authorized by the MOA is rejected." (Lee Decl., Ex. 47 (June 14, 2022 New York Supreme Court Order) (Dkt. No. 55-51) at 4) Defendants contend that this ruling has preclusive effect here. (See Def. Br. (Dkt. No. 56) at 30)

Plaintiff responds that because (1) he was not a party to the state court proceedings, and (2) there was no hearing on the merits of his claim, his claims are not precluded. (See Pltf. Opp. Br. (Dkt. No. 53) at 20) Although it appears that Plaintiff is in privity with the PBA, see Cox v. Perfect Bldg. Maint. Corp., No. 16-CV-7474 (VEC), 2017 WL 3049547, at *4 (S.D.N.Y. July 18, 2017)

2.      **Pretext**

Defendants have made the necessary showing at the second step of the

McDonnell Douglas burden-shifting analysis by offering evidence of a non-retaliatory reason for

Plaintiff's transfer:  Plaintiff's conduct during the October 21, 2021 One Dine incident at One

World Trade Center.  (Def. Br. (Dkt. No. 56) at 27-28)  Therefore, the burden shifts to Plaintiff

to demonstrate that the October 21, 2021 One Dine incident was a pretextual reason for what was

in fact a retaliatory transfer.  Cox, 769 F.3d at 145.

As discussed above, on October 21, 2021, Plaintiff attempted to access One Dine,

a restaurant at the top of One World Trade Center.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 75)  He

arrived at the security checkpoint for One Dine nearly an hour later than his reservation.  He was

wearing his PAPD police badge and PAPD ID around his neck, and he was accompanied by a

---

("In the context of labor unions and grievances filed on behalf of union members pursuant to collective bargaining agreements, the union is in privity with the member provided that the member belonged to the [union] at all relevant times, and the union was the sole and exclusive collective bargaining representative [for its members].") (internal quotations omitted), Defendants have not met their burden of demonstrating that the other necessary elements of claim preclusion have been met.

Under New York law, collateral estoppel applies where two requirements are met:  "(1) the identical issue must have been necessarily decided in the prior action and must be decisive in the present action, and (2) the party who is precluded from relitigating the issue must have had a full and fair opportunity to contest the matter in the prior action."  Strough v. Inc. Vill. of W. Hampton Dunes, 78 A.D. 3d 1037, 1039 (2d Dept. 2010) (citation omitted); see also In re Sokol, 113 F.3d 303, 306 (2d Cir. 1997) ("[T]he preclusive effect of a state court determination in a subsequent federal action is determined by the rules of the state where the prior action occurred.").

Here, it is obvious that the "identical issue" requirement is not met.  The issue before the state court was whether the transfer was "authorized by the MOA."  (Lee Decl., Ex. 47 (June 14, 2022 New York State Supreme Court Order) Dkt. No. 55-51) at 4)  The issue before this Court is whether Defendants' transfer of Plaintiff constitutes retaliation for purposes of Title VII. Moreover, an application to stay or compel arbitration under CPLR 7503 does not constitute an adjudication on the merits, see In re City of Lockport (Lockport Pro. Firefighters Ass'n, Inc.), 141 A.D.3d 1085, 1087 (4th Dept. 2016), and thus cannot have preclusive effect.

uniformed PAPD officer.  (Id. ¶¶ 76-84)  When he attempted to pass through the security

checkpoint to access the restaurant, Plaintiff was advised that it was too late for him to access the

restaurant.  (Id. ¶ 88)  He asked to be let up to the restaurant as a "courtesy," but that request was

denied.  (Id. ¶ 85)

Defendants contend that during Plaintiff's encounter with One Dine's security

staff, he became loud, argumentative, and "made physical contact" with a security manager.  (Id.

¶¶ 89-93)  The PAPD Police Integrity Unit investigated the incident, interviewing eleven

individuals, most of whom were present for the incident.  (Id. ¶¶ 99-100; Lee Decl., Ex. 45 (Oct.

24, 2021 Police Integrity Unit Rep.) (Dkt. No. 55-49) at 2)

Those interviewed by the Police Integrity Unit provided information that is

generally consistent with Defendants' version of events:  namely, that Plaintiff argued with the

security guards who were refusing to allow him to pass the security checkpoint, telling them they

were making a mistake by not letting him in.  (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 101; see also

Lee Decl., Ex. 36 (Oct. 22, 2021 Police Integrity Unit Fajardo Interview) (Dkt. No. 55-40) at 3

(uniformed PAPD officer who accompanied Plaintiff to the security checkpoint stating that

Plaintiff "began to get loud with [the security guards] and flash[ed] his badge and identification,"

stating "[t]his is my building."); id., Ex. 38 (Oct. 25, 2021 Police Integrity Unit Controneo

Interview) (Dkt. No. 55-42) at 3 (security guard describing Plaintiff as "out of control," going on

a "rant," and stating "this is my fuckin' building"); id., Ex. 40 (Oct. 25, 2021 Police Integrity

Unit Tinnin Interview) (Dkt. No. 55-44) at 2 (security guard describing Plaintiff as "giving

attitude," "irate a little bit," and stating "I own this fucking building"); id., Ex. 41 (Oct. 25, 2021

Police Integrity Unit Alava Interview) (Dkt. No. 55-45) (security guard stating that Plaintiff "was

yelling at Mr. Cotroneo" and saying "I own this building"); id., Ex. 43 (Nov. 9, 2021 Police

Integrity Unit Fajardo Interview) (Dkt. No. 55-47) at 2 (uniformed PAPD officer stating that the One Dine security guards "were not behaving in an unprofessional manner" and "were trying to calm Sergeant James down," and reporting that Plaintiff said "[t]his is fucking crazy. You guys should let me up. I own this building"))

Certain witnesses also told the Police Integrity Unit that – during the encounter at the security checkpoint – James made physical contact with one of the security guards. (See, e.g., Lee Decl., Ex. 36 (Oct. 22, 2021 Police Integrity Unit Fajardo Interview) (Dkt. No. 55-40) at 3 (uniformed PAPD officer who accompanied Plaintiff to the security checkpoint reporting that "Sergeant James approached [the security guard], kind of like shoved him like with the chest, and then that's when the other guy was like hey, like, you have to go"); id., Ex. 38 (Oct. 25, 2021 Police Integrity Unit Controneo Interview) (Dkt. No. 55-42) at 3 (security guard reporting that Plaintiff "turn[ed] around and he kinda [gave] me a shoulder right into my chest"); see also id., Ex. 32 (Video) (Dkt. No. 55-36) at 9:30-9:40 (depicting the physical contact at issue))

The Police Integrity Unit provided its findings to Superintendent Cetnar, and he chose to exercise his right under the Port Authority's MOA with the PBA to transfer Plaintiff to the JFK command "for the good of the service based on the incident at One WTC." (Def. R. 56.1 Stmt. (Dkt. No. 55) ¶¶ 102-03; see also Lee Decl., Ex. 17 (Cetnar Dep.) (Dkt. No. 55-21) at 48:7-12, 50:22-25 (Cetnar testifying that he was "briefed verbally" concerning the results of the Police Integrity Unit's investigation, "probably the next day," and that he was shown "a video of the incident where the sergeant was brushing up or pushing up against the security guard")[13]

---

[13] Plaintiff does not contend that the Police Integrity Unit's investigation was itself discriminatory or skewed.

Plaintiff argues, however, that "[s]ubsequent discovery has revealed that the details of the WTC Incident remain unclear, with some witnesses claiming that there was a physical altercation, and some claiming there was not one." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 155) In support of this argument, Plaintiff cites to (1) the deposition of a security guard who testified, "I did not see anything physical. They were just like very close. Like, chest to chest pretty much." (Balestriere Decl., Ex. A (Robinson Dep.) (Dkt. No. 53-3) at 16); and (2) the deposition of another witness – who was not present at the scene – who testified that the incident involved "maybe a raised voice." (Id., Ex. G (Dietrich Dep.) (Dkt. No. 53-9) at 15-16) According to Plaintiff, "[t]hese disagreements on the facts are exactly what precludes this claim from resolution by way of summary judgment." (Pltf. Opp. Br. (Dkt. No. 53) at 27-28)

What matters at this stage, however, is not exactly what happened on October 21, 2021, at the One Dine security checkpoint. Instead, the key issue is what motivated Superintendent Centar when he transferred Plaintiff to the JFK command. As the Second Circuit has stated, "when considering the legitimacy of an employer's reason for an employment action, we look to 'what "motivated" the employer' rather than to 'the truth of the allegations against [the] plaintiff' on which it relies." Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 275 (2d Cir. 2016) (quoting McPherson, 457 F.3d at 216); see also Rightnour v. Tiffany & Co., 354 F. Supp. 3d 511, 524 (S.D.N.Y. 2019) ("'An employer's good faith belief that an employee engaged in misconduct is a legitimate reason for terminating her and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination.'") (quoting Droutman v. N.Y. Blood Ctr., Inc., No. 03cv5384, 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005) (emphasis in original)). Accordingly, Plaintiff's

argument concerning alleged "disagreements on the facts" (see Pltf. Opp. Br. (Dkt. No. 53) at 27-28) misses the point; what matters is what motivated Cetnar's transfer decision.

More precisely, the relevant issue is whether Plaintiff has proffered evidence, beyond temporal proximity, to suggest that Cetnar's stated reason for transferring Plaintiff is pretextual, such as "weaknesses, implausibilities, inconsistencies, or contradictions" in Cetnar's explanation.  Kwan, 737 F.3d at 847.

Defendants have proffered evidence that Defendant Cetnar – based on the investigation conducted by the Police Integrity Unit – had concluded that Plaintiff had engaged in conduct at the One Dine security checkpoint that created a "client relations" issue that required his transfer from the WTC command, where his responsibilities included One World Trade Center, the building housing the One Dine restaurant.  (See Lee Decl., Ex. 46 (Nov. 1, 2021 email) (Dkt. No. 55-50) at 2; see also Lee Decl., Ex. 17 (Cetnar Dep.) (Dkt. No. 55-21) at 59:5-24 (Cetnar testifying that "we had to remove [James] out of this environment because as a boss he would not be able to perform his duties here as a sergeant because he would be interacting with the same people here.  So it was my decision that I would transfer him out of this command for the sake and the good of the service not to have any additional contact with the security guards that he would be compelled to deal with on a daily basis if there was a situation or a job within any of the World Trade Center complex buildings")  Given Defendants' proffered non-retaliatory explanation for the transfer, Plaintiff must come forward with evidence – beyond mere temporal proximity – to suggest that Cetnar's proffered reason for the transfer is pretextual, and that he was actually motivated by Plaintiff's EEOC charge.  Plaintiff has not made the necessary showing.

As an initial matter, in order "[t]o establish causation, [a retaliation] plaintiff must . . . show that the particular decisionmaker who took the adverse action against the plaintiff had knowledge of the plaintiff's protected activity." Lombardo v. Camuto Grp. LLC, No. 20-CV-10336 (VSB), 2025 WL 104114, at *7 (S.D.N.Y. Jan. 15, 2025) (citing EEOC v. Bloomberg L.P., 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013)); see also Morisseau v. DLA Piper, 532 F. Supp. 2d 595 (S.D.N.Y. 2008), aff'd, 355 F. App'x 487 (2d Cir. 2009) ("While general corporate knowledge is sufficient to establish an employer's knowledge of protected activity in step one of the McDonnell Douglas analysis, it may not suffice to make out a causal connection at step three.") Here, Plaintiff does not argue – much less offer evidence that – Cetnar, the relevant decisionmaker, knew of Plaintiff's protected activity, including the September 9, 2021 EEOC charge of discrimination. Indeed, at Cetnar's deposition Plaintiff's counsel did not even ask Cetnar whether he was aware of Plaintiff's protected activity. Cetnar – for his part – testified that the first time he heard James's name "was the night of the incident at the World Trade Center" (Lee Decl., Ex. 17 (Cetnar Dep.) (Dkt. No. 55-21) at 31:22-25), and that although he "couldn't be 100% certain" he did not "believe" that he had had any conversations about James that were not related to the One Dine incident.  (Id. at 78:21-81:8)  In sum, there is no evidence that Cetnar knew of Plaintiff's protected activity at the time he made the transfer decision.[14]

Nor did Plaintiff's counsel ask Cetnar at his deposition why he transferred Plaintiff from the WTC command to the JFK command, or whether any of Plaintiff's protected activity contributed to that decision.  Instead, Cetnar's unrebutted testimony on this point is that the transfer was necessary because James could no longer "perform his duties [at One World

---

[14]  At deposition, Cetnar testified that – shortly after the December 19, 2019 holiday party incident – he became aware that "there was a complaint made," but there is no evidence that Cetnar was aware that Plaintiff was the source of the complaint.  (See id. at 98:20-101:16)

Trade Center] as a sergeant," given his altercation with the One Dine security guards.  (See id. at 59:5-24)

In sum, other than temporal proximity, Plaintiff has not pointed to even a "scintilla of evidence suggesting that [the] stated reason for [the transfer] is pretext." Adams v. Equinox Holdings, Inc., 662 F. Supp. 3d 444, at 462 (S.D.N.Y. 2023), aff'd, No. 23-608, 2024 WL 1787108 (2d Cir. Apr. 25, 2024).[15]  Accordingly, no reasonable jury could find that Defendants' proffered reason for transferring Plaintiff from the WTC command to the JFK command was pretextual, and Defendants are entitled to summary judgment on Plaintiff's retaliation claim.  See Carr, 76 F.4th at 182 (affirming grant of summary judgment where "no factfinder could reasonably determine that [plaintiff's] protected activities were the but-for cause of" the adverse employment action).

---

[15]  To the extent that Plaintiff argues that he has proffered evidence of disparate treatment – based on how the Port Authority addressed alleged misconduct committed by Zammit and McNerney (see Pltf. Opp. Br. (Dkt. No. 53) at 25-26; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 53-1) ¶ 159) – his arguments are not persuasive. Allegations of "disparate treatment must involve employees that are similarly situated 'in all material respects.'" Naemit v. Vill. of Spring Valley, No. 20 CIV. 1882 (JCM), 2022 WL 1443675, at *13 (S.D.N.Y. May 6, 2022) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).  James is not similarly situated to either Zammit or McNerney.  As discussed above, the Board of Inquiry – and not the Port Authority – made the determination as to what discipline would be imposed on Zammit. (See Def. R. 56.1 Stmt. (Dkt. No. 55) ¶ 67)  As to McNerney, the December 17, 2009 brawl in which he was allegedly involved was not reported to the PAPD until ten years later.  When it was investigated by the OIG, neither McNerney nor the officer he allegedly punched remembered the incident.  Accordingly, the OIG closed its investigation, concluding that the allegation of misconduct was unsubstantiated.  (See Lee Decl., Ex. 48 (Dkt. No. 55-52) (OIG's Closing Memorandum, summarizing its investigation of the 2009 incident))

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt.

No. 54) is granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 54), to enter

judgment for Defendants, and to close this case.

Dated: New York, New York
       March 31, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge